UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

     Robert J. Jakubiak,             Case No. 15-21424-GMH
                                   Chapter 7

       Debtor.

Gilbert Schouten,

       Plaintiff,

     v.                              Adv. Proc. No. 16-02141-GMH

Robert J. Jakubiak,

       Defendant.

**AMENDED DECISION**

       Gilbert Schouten gave debtor Robert Jakubiak a loan, and Jakubiak gave Schouten investment advice. The loan went unpaid. The advice was bad.

       Schouten sued. He commenced an arbitration proceeding with the Financial Industry Regulatory Authority (FINRA) against Jakubiak; Jakubiak's cohort, Timothy Stout; and Jakubiak's former employer, MML Investors Services, LLC, an entity regulated by FINRA. After Jakubiak failed to answer the arbitration complaint, the arbitrator awarded Schouten $75,000 against Jakubiak. A Wisconsin Circuit Court entered a judgment confirming that award.

       When Schouten tried to collect, he discovered for the first time that this court had granted Jakubiak a chapter 7 discharge. Schouten hadn't received notice of Jakubiak's

bankruptcy because Jakubiak hadn't listed Schouten, scheduled his debt to Schouten, or included Schouten on the mailing matrix. Schouten now asks this court to declare that Jakubiak's discharge does not bar Schouten from collecting his $75,000 judgment. Both parties seek summary judgment.

I

The following facts are uncontested, except as otherwise noted.

A

Schouten had retired before the dealings with Jakubiak happened. His income came from a modest retirement fund. CM-ECF Doc. No. 18, ¶¶22–24.[1]

Schouten says that he and Jakubiak were bowling buddies. CM-ECF Doc. No. 14, at 2. Beginning in May 2006, Jakubiak, who has worked as a financial advisor, offered to assist Schouten with his investments. CM-ECF Doc. No. 18, ¶¶25, 26, 28 & 30.

Jakubiak advised Schouten to make several transfers of Schouten's retirement funds among a variety of index-based annuities. *Id.* ¶¶28, 44; CM-ECF Doc. No. 25-2, ¶8. Acting on Jakubiak's advice, Schouten moved his retirement funds several times: first to Physician's Mutual in 2006; then to American Investor's Life in 2007, which became AVIVA; then to Forethought Destination Indexed Annuity in 2009. CM-ECF Doc. No. 18, ¶¶28, 31, 37–38 & 45. Jakubiak signed as "Agent" for the 2006 and 2007 transfers. *Id.* ¶¶29 & 32. Stout, Jakubiak's colleague at MML Investors Services, LLC, was the agent for the 2009 transfer, though Jakubiak referred to himself as "agent" on a cover letter for the annuity contract with Forethought. *Id.* ¶¶38–39.

In August 2008, Jakubiak first asked Schouten for a loan. *Id.* ¶34. Schouten agreed. He loaned Jakubiak $25,000 sometime between August 30 and September 2,

---

[1] Citations to the record in this adversary proceeding are in the form, "CM-ECF Doc. No. __." Citations to the record in the Jakubiaks' bankruptcy case are in the form, "Case No. 15-21424, CM-ECF Doc. No. __," and citations to the adversary proceeding filed by the United States trustee against Jakubiak are in the form, "Adv. Proc. No. 16-2194, CM-ECF Doc. No. __."

2008; $10,000 on September 8, 2008; $15,000 in December 2008; and another $25,000 in November 2009. *Id.* ¶¶34–35; CM-ECF Doc. No. 16, at 35. To make these loans, Schouten drew down on a line of credit secured by his home. CM-ECF Doc. No. 18, ¶35.

Jakubiak's promises of repayment went unfulfilled. He repaid only $338.25. *Id.* ¶43.

In 2011, Jakubiak recommended that Schouten transfer the annuity funds from Forethought back to AVIVA. *Id.* ¶¶45–46. A Forethought representative tipped off Schouten that Jakubiak, pretending to be Schouten, had been calling Forethought to expedite issuance of a surrender check. *Id.* ¶¶47–56. This revelation led Schouten to ask Tony Drake, a certified financial planner, about how the funds had been handled. *Id.* ¶57. According to Schouten, Drake discovered that the Jakubiak-advised annuity transfers followed a path of escalating commissions, and the Forethought application misrepresented Schouten's net worth and assets. *Id.* ¶¶58–60; CM-ECF Doc. No. 16, at 13, ¶30. After meeting with Drake, Schouten stopped the Forethought-AVIVA transfer and his dealings with Jakubiak. CM-ECF Doc. No. 18, ¶59; CM-ECF Doc. No. 16, at 14, ¶32.

## B

On September 25, 2012, Schouten filed an arbitration claim with FINRA against Jakubiak; Stout; and MML Investors Services, Jakubiak's and Stout's former employer. CM-ECF Doc. No. 18, ¶1. Schouten alleged four claims against Jakubiak: (1) fraud and misrepresentation, (2) breach of a duty to recommend only suitable investments, (3) breach of contract, and (4) breach of fiduciary duty. CM-ECF Doc. No. 22-1, ¶¶36–64. Schouten alleged against all of the defendants "jointly and severally" actual total damages of $216,418.58: he claimed alleged losses of $74,705.62 in surrender charges from annuity flipping; $67,712.96 of lost interest accrual; and $75,000 of unpaid loans (which a keen reader will realize totals $217,418.58, rather than $216,418.58). CM-ECF Doc. No. 16, at 7–24; CM-ECF Doc. No. 22-1, at 22. Jakubiak did not appear or otherwise

contest the claims. CM-ECF Doc. No. 18, ¶¶3 & 5.

On February 10, 2014, the FINRA arbitrator issued a $75,000 default award against Jakubiak. CM-ECF Doc. No. 20-2. The award states:

> Respondent Jakubiak knew, or should have known, that securities law prohibits brokers from borrowing money from clients. Attachments to claim (Exhibits C, D, E & H) [i]ndicate that Respondent Jakubiak personally received four checks from Claimant Schouten without an indicated investment purpose or action for Claimant. . . . Respondent, Robert Joseph Jakubiak, is liable for and shall pay to Claimant $75,000.00 in compensatory damages.

*Id.* at 2. The award further states, "All other relief requests are denied." *Id.*

Schouten filed a petition in the Milwaukee County Circuit Court to confirm the award. CM-ECF Doc. No. 18, ¶12. Jakubiak did not appear. *Id.* ¶¶13–14. On July 8, 2014, the circuit court entered an order for default judgment directing entry of judgment against Jakubiak in the amount of $75,000, plus $1,283.73 in prejudgment interest. CM-ECF Doc. No. 1, Ex. L. The circuit court docketed a judgment to that effect on December 4, 2014. *Id.* at 3; CM-ECF Doc. No. 18, ¶15.

II

A

On February 19, 2015, Jakubiak and his wife jointly petitioned for bankruptcy under chapter 7. Case No. 15-21424 (Bankr. E.D. Wis.). The Jakubiaks did not list Schouten in their list of creditors or schedule the debt owed Schouten. Case No. 15-21424, CM-ECF Doc. No. 1. The clerk notified the Jakubiaks' listed creditors that the Jakubiaks' bankruptcy estate appeared to have no assets to distribute to creditors, so creditors should not file a proof of claim unless later told to do so. Case No. 15-21424, CM-ECF Doc. No. 3 & 4.

On May 1, 2015, soon after the Jakubiaks amended their schedules to list additional personal property and claim further exemptions, the chapter 7 trustee

reported that the estate had no property available for distribution. The court granted the Jakubiaks a discharge on June 3, 2015, two days after the June 1, 2015 deadline for objecting to discharge or dischargeability. Case No. 15-21424, CM-ECF Doc. No. 9. The court then closed the case.

B

Six months later, Schouten moved to reopen the Jakubiaks' case to file a complaint seeking a determination that the $75,000 judgment was not discharged. Case No. 15-21424, CM-ECF Doc. No. 11. No one objected to that request, so the court granted it. Case No. 15-21424, CM-ECF Doc. No. 13.

Two adversary proceedings followed. Schouten filed this proceeding. The United States trustee filed an adversary proceeding requesting that the court revoke the Jakubiaks' discharge, alleging that the Jakubiaks had falsely testified that they had listed all their creditors and scheduled all of their debts, even though they had failed to list Schouten and schedule their debt to him. Adv. Proc. No. 16-2194 (Bankr. E.D. Wis. filed May 31, 2016), CM-ECF Doc. No. 1.

Several months later, the U.S. trustee moved to dismiss his proceeding. Adv. Proc. No. 16-2194, CM-ECF Doc. No. 7. In so doing, he reported only that counsel for the Jakubiaks in the adversary proceedings had made an "admission that the errors and omissions that were the basis for the Complaint were not intentional on the part of the Debtors but rather were due to an oversight of [the Jakubiaks' former] bankruptcy counsel." Adv. Proc. No. 16-2194, CM-ECF Doc. No. 7, at 2. No one objected. The court dismissed that proceeding. Adv. Proc. No. 16-2194, CM-ECF Doc. No. 10.

Schouten then actively pursued in this proceeding a declaration that Jakubiak's debt to him is excepted from the discharge. After discovery closed, both parties moved for summary judgment. CM-ECF Doc. Nos. 13 & 19.

III

A

This court has jurisdiction over this adversary proceeding by operation of
28 U.S.C. §1334 and the Eastern District of Wisconsin's order of reference under
28 U.S.C. §157(a). See Order of Reference (E.D. Wis. July 10, 1984), available at
http://www.wied.uscourts.gov/local-rules-and-orders. This proceeding to determine the
dischargeability of a debt is a core proceeding under 28 U.S.C. §157(b)(2)(I). Thus,
§157(b)(1) authorizes this court to enter a final judgment.

B

Federal Rule of Civil Procedure 56(a) (made applicable to this adversary
proceeding by Federal Rule of Bankruptcy Procedure 7056) provides, "The court shall
grant summary judgment if the movant shows that there is no genuine dispute as to
any material fact and the movant is entitled to judgment as a matter of law." The court
must "construe the evidence in the light most favorable to the non-moving party . . .
and give that party the benefit of genuine conflicts in the evidence and all reasonable,
favorable inferences." *Carman v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014).

IV

A chapter 7 discharge order "discharges the debtor from all debts that arose
before the date of the order for relief under this chapter", "[e]xcept as provided in
section 523 of this title". 11 U.S.C. §727(b). Jakubiak's debt to Schouten arose before the
order for relief, so the debt has been discharged unless §523 provides otherwise. The
parties' dueling motions for summary judgment dispute whether Jakubiak owes
Schouten a debt that is excepted from discharge under subsections (a)(2), (a)(3), (a)(6),
and (a)(19) of §523.

A

The parties have principally focused their summary judgment arguments on the
extent to which the confirmed arbitration award is determinative of Schouten's §523(a)

claims. Schouten argues that the *Rooker-Feldman* doctrine, as well as claim and issue preclusion, support his request for summary judgment. Jakubiak responds that preclusion principles instead support awarding him summary judgment. Ultimately, these principles do not carry the day for either party.

1

Schouten contends that "*Rooker-Feldman* precludes any argument in this Court that the [state-court judgment confirming the arbitration award] made invalid or mistaken findings." CM-ECF Doc. 14, at 12. From there, he leaps to a conclusion that the doctrine entitles him to judgment on his §523(a)(19) claim. See *id.*

There's no need to move past the launch point. *Rooker-Feldman* is the doctrinal call sign for the fact that title 28 of the United States Code primarily gives federal trial courts original, as opposed to appellate, jurisdiction. See, e.g., 28 U.S.C. §§ 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."), 1332(a) ("The district courts shall have original jurisdiction" of certain diversity suits.), 1333(1) ("The district courts shall have original jurisdiction . . . of . . . [a]ny civil case of admiralty or maritime jurisdiction . . . .") & 1334(a) ("[T]he district courts shall have original . . . jurisdiction of all cases under title 11."). Federal trial courts, including bankruptcy courts, thus generally lack jurisdiction over claims by persons who have litigated and lost in earlier state-court proceedings, if the relief they seek is inconsistent with the judgment in those earlier proceedings. See generally *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). Relief from an erroneous state-court judgment must be pursued by appeal, not in a new federal-court proceeding.

Neither Schouten's §523 claims nor Jakubiak's defenses to them call into question the *correctness* of the state-court judgment confirming the arbitration award. The issues here involve only whether, by operation of 11 U.S.C. §524(a), this court's discharge

order prohibits Schouten from enforcing the state-court judgment or whether that enforcement is permitted because the debt Jakubiak owes Schouten is of a kind excepted from discharge by 11 U.S.C. §523(a). This court unquestionably has original jurisdiction to decide those issues. See 28 U.S.C. §§157 & 1334; Order of Reference, *supra. Rooker-Feldman* does not apply.

2

Both parties argue that claim preclusion (res judicata) and issue preclusion (collateral estoppel) entitle them to summary judgment. CM-ECF Doc. No. 14, at 10–12, 14; CM-ECF Doc. No. 20, at 8 & 10. These arguments are misplaced to the extent directed toward Schouten's claim that the debt is excepted from discharge under §523(a)(19) because, as will be discussed further below, that section excepts debts, as applicable in this case, that result from a judgment for a violation of securities laws covered by 11 U.S.C. §523(a)(19). Determining whether the judgment is for a violation of a covered securities law involves determining first what the judgment is for (a state-law question) and then whether it is for a violation covered by §523(a)(19)(A) (a federal-law question). None of this involves application of preclusion doctrines, which define a judgment's limiting effect on subsequent litigation by parties to the judgment. Compare *Meyer v. Rigdon*, 36 F.3d 1375, 1380 (7th Cir. 1994) (11 U.S.C. §523(a)(11), which excepts from discharge debts provided in certain judgments arising out of fraud or defalcation committed against particular financial institutions, displaces state-law collateral estoppel).

Schouten's state-court judgment may have preclusive effect on his other §523(a) claims. See *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991) ("[C]ollateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a)."). The preclusive effect of the judgment on those claims is a question of state law. 28 U.S.C. §1738; see also *GASH Assocs. v. Village of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993). A Wisconsin circuit court entered a judgment confirming the arbitration award,

thereby giving the award the "same force and effect . . . as . . . a judgment in an action; and it may be enforced as if it had been rendered in an action in the [circuit] court". Wis. Stat. §788.14(3); see also *Manu-Tronics, Inc. v. Effective Mgmt. Sys., Inc.*, 471 N.W.2d 263, 266 (Wis. Ct. App. 1991) ("Essential to arbitration remaining useful is the elementary principle that the doctrines of res judicata and collateral estoppel are applicable to arbitration awards.").

a

*Claim preclusion*. Under Wisconsin law, "[t]he doctrine of claim preclusion provides that a final judgment on the merits in one action bars parties from relitigating any claim that arises out of the same relevant facts, transactions, or occurrences." *Kruckenberg v. Harvey*, 694 N.W.2d 879, 884 (Wis. 2005). In applying this analysis, one "looks to see if the claim asserted in the second action should have been presented for decision in the earlier action, taking into account practical considerations relating mainly to trial convenience and fairness." *Id.* (quoting Robert C. Casad & Kevin M. Clermont, *Res Judicata: A Handbook on Its Theory, Doctrine, and Practice* 66 (2001)).

As a practical matter there is no opportunity to raise a §523(a) claim in litigation before one of the combatants files a bankruptcy petition. Until a party seeks a bankruptcy discharge it is unreasonable to expect that party or his creditors to litigate whether the party's debts are of a kind §523(a) excepts from discharge. Because Schouten's judgment against Jakubiak preceded Jakubiak's bankruptcy filing, that judgment has no claim-preclusive effect on whether §523(a) excepts Jakubiak's debt to Schouten from discharge. See *Brown v. Felsen*, 442 U.S. 127 (1979) (section 523(a) claim not barred by res judicata); *Hellenbrand Glass, LLC v. Pulvermacher (In re Pulvermacher)*, 567 B.R. 881, 887 (Bankr. W.D. Wis. 2017) ("[C]laim preclusion does not apply in nondischargeability actions under section 523".).

b

*Issue preclusion*. Under Wisconsin law, issue preclusion applies only to legal and

factual questions that were actually litigated and necessary to an earlier proceeding's resolution: "If the issue actually has been litigated and is necessary to the judgment, the . . . court must then conduct a fairness analysis to determine whether it is fundamentally fair to employ issue preclusion given the circumstances of the particular case at hand." *Mrozek v. Intra Fin. Corp.*, 699 N.W.2d 54, 61 (Wis. 2005) (citations omitted).

Wisconsin generally treats issues resolved by default judgment as not having been actually litigated: "In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, [the issue preclusion rule] does not apply with respect to any issue in a subsequent action." *Heggy v. Grutzner*, 456 N.W.2d 845, 849 (Wis. Ct. App. 1990) (insertion in original) (internal quotation marks omitted); see also *Deminsky v. Arlington Plastics Mach.*, 638 N.W.2d 331, 346–47 (Wis. Ct. App. 2001), aff'd as modified and remanded, 657 N.W.2d 411 (Wis. 2003).

Both Schouten's state-court judgment and the arbitration award were entered against Jakubiak in default. Issue preclusion is inapplicable.

B

Turning to Schouten's individual claims, the parties' main emphasis is on whether 11 U.S.C. §523(a)(19) excepts Jakubiak's debt to Schouten from discharge. That provision, to the extent relevant here, excepts from discharge debts resulting from a judgment that is for a violation of certain securities laws. It states:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt— . . .
>
> (19) that—
>
> (A) is for—
>
> (i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or

order issued under such Federal or State securities laws; or

>(ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

(B) results, before, on, or after the date on which the petition was filed, from—

>(i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

>(ii) any settlement agreement entered into by the debtor; or

>(iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

11 U.S.C. §523(a)(19). To establish that §523(a)(19) excepts the debt from discharge Schouten must demonstrate that "(1) the debt stems from a violation of federal or state securities laws or common law fraud in connection with the purchase or sale of a security; and (2) the debt is memorialized in a judicial or administrative order or in a settlement agreement." *Simon v. Boccarsi (In re Boccarsi)*, 578 B.R. 800, 808 (Bankr. N.D. Ill. 2017); see also *Bryant v. Clements (In re Clements)*, 570 B.R. 803, 808–09 (Bankr. W.D. Wis. 2017).

1

Both parties contend that summary judgment is appropriate on Schouten's §523(a)(19) claim. They agree that the debt is memorialized in the judgment confirming the arbitration award. They disagree only about whether the debt is for a violation of an applicable securities law or a regulation or order issued under such a law.

Whether the award, and thus the debt, is for a violation of a securities law or a regulation or order issued under such law requires determining whether the award "results from" such a violation. 11 U.S.C. §523(a)(19)(B). See also *Lunsford v. Process Techs. Servs., LLC (In re Lunsford)*, 848 F.3d 963, 967–68 (11th Cir. 2017); *Cohen v. de la*

*Cruz*, 523 U.S. 213, 220 (1998).

Schouten contends that, as a matter of law, the debt memorialized in the confirmed award is for a securities-law violation. CM-ECF Doc. No. 14, at 8–9. (He does not argue that the debt stems from common-law fraud in connection with the purchase or sale of a security.) Conversely, Jakubiak contends that, as a matter law, the judgment is *not* for a securities-law violation but is instead for breach of contract. CM-ECF Doc. No. 25, at 5.

In arguing that the arbitration award is for a securities-law violation, Schouten emphasizes the award's statement that Jakubiak knew or should have known that "securities laws" prohibited Jakubiak from borrowing money from Schouten. He relies on the following statement from the arbitration award:

> Respondent Jakubiak knew, or should have known, that securities law prohibits brokers from borrowing money from clients. Attachments to claim . . . [i]ndicate that Respondent Jakubiak personally received four checks from . . . [Schouten] without an indicated investment purpose or action for [Schouten].

> Respondent Stout acted improperly in facilitating Respondent Jakubiak's transferring of Claimant Schouten's annuity amounts.

CM-ECF Doc. No. 20-2, at 2.

Jakubiak, on the other hand, contends that the award is based solely on his failure to repay the loans as he promised. CM-ECF Doc. No. 25, at 5. Jakubiak emphasizes that the arbitrator awarded Schouten $75,000, the total amount Jakubiak borrowed from Schouten, rather than the amount Schouten alleged flowed from Jakubiak's annuity-flipping scheme. CM-ECF Doc. No. 20, at 5–9. Jakubiak also juxtaposes the $75,000 award against Jakubiak with the arbitrator's award of $16,142.41 against Stout, who allegedly facilitated Jakubiak's annuity dealings on Schouten's behalf. CM-ECF Doc. No. 29, at 32:54–33:35, 48:01–49:40. In explaining the $16,142.41 award against Stout, the arbitrator wrote that this was the amount Schouten "lost in the

transfer" from the American Investors Life Annuity to Forethought Destination Indexed Annuity—one of the allegedly wrongful investments Schouten claimed Jakubiak and Stout orchestrated. CM-ECF Doc. No. 20-2, at 2. In addition to not awarding this lost-in-the-transfer amount against Jakubiak, the arbitration award states, "All other relief requests are denied." *Id.* Jakubiak reads these statements to mean that the award against him was only for breach of contract, rather than for violating a securities law. Additionally, Jakubiak contends that the only prohibition on borrowing Schouten alleged was FINRA rule 3240, which, he argues, (1) is not a "securities law" or a "regulation" issued under a federal securities law within the meaning of §523(a)(19); (2) did not apply to him when Schouten made the loans; and, (3) even if violated, could not give rise to the debt. CM-ECF Doc. No. 25, at 4–6.

2

To determine whether the debt resulting from the confirmed arbitration award is "for" a violation of a federal or state securities law the court must interpret the award. The law of the state entering judgment confirming the award, here, Wisconsin, controls that interpretation. See *Bone v. City of Lafayette*, 919 F.2d 64, 66 (7th Cir. 1990); *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992).

Wisconsin courts "interpret[] judgments in the same manner as other written instruments." *Morrison v. Rankin*, 760 N.W.2d 441, 445 (Wis. Ct. App. 2008). Courts interpret unambiguous judgments based solely on their terms. *Id.* But when a judgment is ambiguous—when its terms are open "to more than one reasonable interpretation, either on its face or as applied to the extrinsic facts to which it refers"—a court must interpret the judgment in light of the context and circumstances in which it arose. *Id.*; see also *Estate of Schultz v. Schultz*, 535 N.W.2d 116, 118–19 (Wis. Ct. App. 1995).

a

Neither the arbitration award nor the judgment confirming it unambiguously awards damages against Jakubiak for violation of a securities law to which §523(a)(19)

applies. The award says that (a) "Jakubiak knew, or should have known, that securities law prohibits brokers from borrowing money from clients" and (b) Jakubiak received funds from Schouten that had no investment purpose. CM-ECF Doc. No. 20-2, at 2. The award does not specify the "securities law" to which it refers.

Schouten argues that by "securities law" the award means that Jakubiak violated a rule promulgated first by the National Association of Securities Dealers (NASD) and subsequently by FINRA. Schouten then argues that this rule is a "securities law" for §523(a)(19) purposes. He asserts that "violation of FINRA rules is . . . a violation of rules that the Securities Exchange Commission prescribes, and falls within the § 523(a)(19) Subsection A requirement [that the debt be for the violation of federal or state securities laws]." CM-ECF Doc. No. 14, at 9 n.3; see also CM-ECF Doc. No. 23, at 9–10.

Jakubiak correctly responds that FINRA rules are not federal "securities laws" within the meaning of §523(a)(19). CM-ECF Doc. No. 20, at 5–6. Section 523(a)(19) only applies to "Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws". 11 U.S.C. §523(a)(19)(A)(i). Section 3(a)(47) of the Securities Exchange Act of 1934 states:

> The term "securities laws" means the Securities Act of 1933 (15 U.S.C. 77a et seq.), the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), the Sarbanes-Oxley Act of 2002 [15 U.S.C. 7201 et seq.], the Trust Indenture Act of 1939 (15 U.S.C. 77aaa et seq.), the Investment Company Act of 1940 (15 U.S.C. 80a–1 et seq.), the Investment Advisers Act of 1940 . . . [15 U.S.C. 80b–1 et seq.], and the Securities Investor Protection Act of 1970 (15 U.S.C. 78aaa et seq.).

15 U.S.C. §78c(a)(47).

FINRA rule 3240 is not among these federal statutes, nor is it a "regulation or order" issued under any of these statutes by a government agency. FINRA is a private, non-profit corporation whose members are registered brokers and dealers of securities

in the United States. See FINRA Certificate of Incorporation and FINRA By-Laws, Article 1, available at http://finra.complinet.com (last visited Sept. 26, 2018). The Seventh Circuit has explained that FINRA is a private regulator of the securities industry that promulgates its own governing rules with SEC oversight:

> FINRA is a private, non-profit corporation that is registered with the Securities and Exchange Commission (SEC) as a "national securities association." Such private regulation was made possible by the Maloney Act, which provided for the establishment of self-regulatory organizations to oversee the securities markets. 15 U.S.C. §§ 78o et seq. In this capacity FINRA creates and enforces rules that govern the industry alongside the SEC and is subject to significant SEC oversight. The SEC must approve all of FINRA's rules, 15 U.S.C. § 78s(b)(1), and the SEC may abrogate, add to, and delete from all FINRA rules as it deems necessary. 15 U.S.C. § 78s(c).

*Aslin v. FINRA*, 704 F.3d 475, 476 (7th Cir. 2013). FINRA rule 3240 was promulgated by FINRA, rather than by the SEC, and Schouten does not argue otherwise.

Instead, Schouten argues that SEC oversight transforms all of FINRA's rules into regulations under the federal securities laws described in §523(a)(19). Schouten states, "[V]iolation of FINRA rules is . . . a violation of rules that the Securities Exchange Commission prescribes, and falls within [] § 523(a)(19) . . . ." CM-ECF Doc. No. 14, at 9 n.3. He contends further that, so understood, "FINRA rules have the status of federal law". See CM-ECF Doc. No. 23, at 9 (citing 15 U.S.C. §78s(c); *Empire Fin. Grp., Inc. v. FINRA*, 2009 WL 10644856, *4–6 (S.D. Fla. Jan. 15, 2009)).

Schouten is correct that (1) FINRA's rulemaking is supervised by the SEC; (2) federal law requires securities brokerage firms to register with FINRA; and (3) FINRA's rules require brokerage firms' employees to register with FINRA. See *Aslin*, 704 F.3d at 476. But none of this, nor anything else, transforms FINRA's rules into "regulations" or "orders" issued under the pertinent securities laws. See *Ford v. Hamilton Invs., Inc.*, 29 F.3d 255, 259 (6th Cir. 1994) ("A breach of the NASD rules does not present a question that arises under the laws of the United States within the

meaning of 28 U.S.C. §1331 . . . ."); *Kenosha Unified Sch. Dist. v. Stifel Nicolaus & Co.*, 607 F. Supp. 2d 967, 977–78 (E.D. Wis. 2009) (FINRA rules are not "rules" or "regulations" for purposes of section 27 of the Securities Exchange Act of 1934, 15 U.S.C. §78aa.).

Even accepting that FINRA rules may have the "effect" of federal law for some purposes, that effect does not transform those rules into "regulation[s] . . . issued under . . . Federal or State securities laws" for purposes of §523(a)(19). The federal securities laws to which §523(a)(19) refers expressly authorize the SEC to promulgate regulations through notice-and-comment rulemaking. See 15 U.S.C. §§77s(a), 78w(a), 80a-37(a), 80b-11(a) & 7202(a). The SEC's oversight of FINRA does not transform private-party rules into "regulations" as that term is used in §523(a)(19).

Schouten's fallback argument is that, because the SEC may only approve FINRA rules that are consistent with the Securities Exchange Act and regulations promulgated under it, "violation of an SEC[-]approved FINRA Rule is also a violation of federal securities law." CM-ECF Doc. No. 23, at 9–10. This is unpersuasive too.

FINRA's no-loan-solicitation rule can be *consistent* with federal law's prohibitions on the use of manipulative, deceptive, or fraudulent devices in connection with the purchase or sale of any security even if not every loan solicitation that offends the FINRA rule would also constitute an unlawful device in connection with the purchase or sale of a security. Schouten's focus on a violation of the FINRA rule, which is not itself a violation of a securities law or regulation within the scope of §523(a)(19), underscores the difficulty of inferring from the award that the award is for the violation of a covered securities law. If, as Schouten supposes, the award's statement that "Jakubiak knew, or should have known, that securities law prohibits brokers from borrowing money from clients" was premised on FINRA rule 3240, then the award is not for a violation of securities laws to which §523(a)(19) applies.

The award's text simply does not reasonably establish that the award is based on

a violation of a securities law that *is* covered by §523(a)(19). As the award's summary of Schouten's claims explains, Schouten alleged causes of action for "fraud and misrepresentations; unsuitability; *breach of contract* and implied covenant of good faith and fair dealing; breach of fiduciary duty; negligent supervision; and respondeat superior." CM-ECF Doc. No. 20-2, at 1 (emphasis added). The award describes Schouten's claims as based in part on an allegation "that [Schouten] gave Jakubiak $75,000 in personal loans which have never been repaid"—a statement that fits far more naturally with an award for breach of contract than for a violation of securities laws. *Id.*

Additionally, the award's claim description demonstrates that the arbitrator was aware that Schouten contended "that Jakubiak and Stout engaged in this annuity flipping strategy", which was "responsible for all surrender fees and loss of profits to his account." *Id.* But, although the award directs Stout to pay $16,142.41—the amount Schouten allegedly lost in one of the annuity transfers—it does not also require Jakubiak to pay this amount. *Id.* at 2. Instead, the award directs Jakubiak to pay $75,000—the amount of the unrepaid loans—"in compensatory damages" without specifying what this amount is intended to compensate. *Id.* A reasonable inference— indeed, *the* most reasonable inference—is that the award compensates Schouten for the $75,000 of loans that Jakubiak never repaid.

In all events, the award's text does not clearly state that the award is "for" a violation of a covered securities law.[2]

---

[2] Schouten argues in a footnote that sections of the Wisconsin Statutes and the Wisconsin Administrative Code prohibit persons who advise customers about insurance to engage in personal financial transactions with those customers. CM-ECF Doc. No. 23, at 10 n.8 (discussing Wis. Stat. §628.02; Wis. Admin. Code Ins. §6.60). Undeveloped arguments in footnotes are waived. *Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) (collecting cases); *Gross v. Town of Cicero*, 619 F.3d 697, 704–05 (7th Cir. 2010). Moreover, the provisions cited are part of Wisconsin's *insurance* laws and regulations, not its securities laws and regulations. And Schouten's arbitration complaint did not refer to these insurance-law provisions, so the award cannot reasonably be understood to be "for" their violation. See CM-ECF Doc. No. 16.

b

Where an award is unclear, Wisconsin interpretive law, as explained earlier, directs one next to review the context and circumstances in which the award arose.

Schouten's statement of claim in the arbitration alleged that Jakubiak "knowingly and recklessly made representations and recommendations which [representations] acted as a fraud, in violation of the securities laws including Rule 10b-5 of the Securities Exchange Act of 1934 and Wis. Stat. §§551.501 et. seq." CM-ECF Doc. No. 16, at 15, ¶37. Schouten's claim pleaded, as one of these representations, a failure to disclose that FINRA rule 3240 prohibited Jakubiak from soliciting loans. *Id.* at 17, ¶39g. Schouten alleged that the intent of these misrepresentations "and omissions was to induce Schouten into switching his annuities despite the significant surrender penalties, *and to induce Schouten into providing personal loans to Jakubiak at great personal risk.*" *Id.* ¶40 (emphasis added). Schouten further alleged that, as a result of the misrepresentations and omissions, he "suffered substantial surrender charges, lost future earnings, *and lost loan principal*", which, "[p]ursuant to Wis. Stat. §551.509, . . . entitled [Schouten] to actual damages along with reasonable attorney fees." *Id.* at 17–18, ¶¶42–43 (emphasis added). Section 551.509 provides civil remedies for violations of Wisconsin securities law.

These allegations provide some support for interpreting the award to be "for" a violation of a securities law covered by §523(a)(19): The arbitrator expressly found that "Jakubiak knew, or should have known, that securities law prohibits brokers from borrowing money from clients" and "Jakubiak personally received four checks from Claimant Schouten without an indicated investment purpose or action for Claimant." CM-ECF Doc. No. 20-2, at 2. While the arbitrator's finding is opaque, it could be understood in context as ruling that in borrowing $75,000 from Schouten, Jakubiak knowingly failed to disclose, in violation of Rule 10b-5 and Wisconsin securities law, that he was prohibited from making that solicitation. The arbitrator might have based his decision to direct Jakubiak to pay the principal loan amount—$75,000—on

Schouten's allegation that part of his claimed injury from the fraudulent omission was the loss of the "loan principal". CM-ECF Doc. No. 16, at 17, ¶42.

Perhaps. But the award taken in context with Schouten's statement of claim can also be understood to direct Jakubiak to pay the principal loan amount based on Schouten's claim for "breach of contract and implied covenant of good faith and fair dealing". *Id.* at 19–20 (capitalization altered). Schouten pleaded in this claim that he sought to recover "incurred actual damages" for "a gross breach of the duty of care of investment advisers, breach of duty of good faith and fair dealing, and reckless disregard for [Jakubiak's and the other respondents'] contractual obligations." *Id.* at 20–21, ¶¶57–58. And, although this breach-of-contract claim incorporates all of the complaint's previous allegations, nothing about the claim's allegations suggests in context that the claim should be understood to arise under federal or state securities law. The breach-of-contract claim arises at least in part, if not entirely, under state contract law.

The award's findings that "Jakubiak knew, or should have known, that securities law prohibits brokers from borrowing from clients" and that Jakubiak received loans from Schouten are just as consistent with understanding the award to be based on Schouten's breach-of-contract claim, which includes an allegation that Jakubiak recklessly disregarded contractual obligations, as with Schouten's fraud claim. In his breach-of-contract claim Schouten alleged, among other things, "Respondents' recommendations to switch annuities multiple times, *and four-time solicitation of Schouten for personal loans*, constitutes a gross breach of the duty of care of investment advisers, breach of good faith and fair dealing, and *reckless disregard for their contractual obligations*." *Id.* ¶57 (emphasis added). Based on these acts, Schouten pleaded in the breach-of-contract claim that he "incurred actual damages as a direct and proximate result in an amount to be determined at hearing." CM-ECF Doc. No. 16, at 21, ¶58. The arbitrator's finding that "Jakubiak knew, or should have known, that securities law

prohibits brokers from borrowing from clients" thus can also be understood to base liability on the reckless-disregard-of-contractual-obligations theory for relief contained in Schouten's breach-of-contract claim. The arbitrator might have concluded that the loss Schouten "incurred as a direct and proximate result" of this (allegedly reckless) breach of contract amounts to "$75,000.00 in compensatory damages"—the amount the arbitrator awarded against Jakubiak. Again, the simplest explanation of the $75,000 award is that it is compensation *for* the $75,000 unpaid loan principal.

Neither of these competing ways of understanding the arbitration award is satisfactory. The fraud and misrepresentation claim alleges that (a) "[t]he intent of [the] representations and omissions was to induce Schouten into switching his annuities despite the significant surrender penalties, *and* to induce Schouten into providing personal loans to Jakubiak"; and (b) "[b]y reason of the aforementioned acts of Respondents, Schouten suffered substantial surrender charges, lost future earnings, *and* lost loan principal." *Id.* at 17, ¶¶40 & 42 (emphasis added). The award limits the compensatory damages against Jakubiak to $75,000—the loan principal. But it also awards compensatory damages of $16,142.41 against Stout—damages the award bases on the surrender penalties from one of the annuity switches; a switch Schouten's complaint alleged was orchestrated by Jakubiak. If the arbitrator determined that Stout was liable on the misrepresentation claim, there is no apparent reason why the award does not also require Jakubiak to pay at least $16,142.41 to compensate Schouten for the wrongful annuity flipping. If the award was based on an allegation that Jakubiak violated the securities laws, why was the award limited to the amount Schouten loaned Jakubiak? And, in awarding damages limited to the loan principal, why did the arbitration award emphasize that Jakubiak "knew, or should have known, that securities law prohibits brokers from borrowing from clients"? CM-ECF Doc. No. 20-2, at 2. Ultimately, the context and circumstances leave substantial doubt about whether the confirmed arbitration award is for a violation of federal or state securities law, as

§523(a)(19)'s exception from discharge requires.

"Exceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor." *Affordable Bail Bonds, Inc. v. Sandoval (In re Sandoval)*, 541 F.3d 997, 1001 (10th Cir. 2008) (internal quotation marks omitted). The doubt about the nature of the arbitration award is immutable: there are no disputed facts that might further clarify whether the award was for a securities-law violation. Both parties approach the interpretation of the judgment as a question of law. The immutable doubt about the basis for the award requires the court to grant summary judgment for Jakubiak on Schouten's §523(a)(19) claim.

### C

Schouten also pleads that Jakubiak's debt was for (i) money obtained because of fraud or false representations, which §523(a)(2) renders nondischargeable, and (ii) a willful and malicious injury, which §523(a)(6) renders nondischargeable. The discharge exceptions found in §523(a)(2) and (6), however, do not apply unless the creditor commences an adversary proceeding so claiming before the deadline set by Federal Rule of Bankruptcy 4007. See 11 U.S.C. §523(c) & Fed. R. Bankr. P. 4007(c); Case No. 15-21424, CM-ECF Doc. No. 3.

Schouten's deadline to request a determination that Jakubiak's debt was nondischargeable under §523(a)(2) or (6) expired June 1, 2015—60 days after the March 31, 2015 first meeting of creditors in Jakubiak's case. See Fed. R. Bankr. P. 4007(c). Because Schouten did not make a timely request, he is not entitled to a nondischargeability determination under §523(a)(2) or (6), and the court must grant summary judgment in Jakubiak's favor on those claims.

### D

Schouten didn't timely request a nondischargeability determination under §523(a)(2) or (6) because, as mentioned earlier, he didn't know that Jakubiak had filed a

bankruptcy petition. CM-ECF Doc. No. 1, ¶¶126–127; CM-ECF Doc. No. 4, ¶61. Schouten didn't know because in addition to not scheduling the debt to Schouten, Jakubiak didn't list Schouten as a creditor or include him on the mailing list that the bankruptcy clerk uses to send creditors notice of the bankruptcy.

These facts give rise to Schouten's claim that Jakubiak's debt is nondischargeable under §523(a)(3). Section 523(a)(3) states in relevant part as follows:

(a) A discharge under [chapter 7] . . . does not discharge an individual debtor from any debt—

. . .

(3) neither listed nor scheduled . . . in time to permit—

(A) if such debt **is not** of a kind specified in . . . [§523(a)(2), (4), or (6)], timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing; or

(B) if such debt **is** of a kind specified in . . . [§523(a)(2), (4), or (6)], timely filing of a proof of claim **and timely request for a determination of dischargeability** of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing **and request** . . . .

11 U.S.C. §523(a)(3) (emphasis added). Under §523(a)(3)'s plain text, if Jakubiak failed either to (i) include Schouten on his list of creditors or (ii) schedule Schouten's claim in time for Schouten to file a proof of claim, and (iii) Schouten was otherwise unaware of the bankruptcy, the debt is excepted from discharge, regardless of whether the debt is of a type specified in §523(a)(2), (4), or (6).

1

Jakubiak does not dispute that he failed to list Schouten and schedule the Schouten debt before Jakubiak received his discharge in June 2015 and the court closed his bankruptcy case. And the bankruptcy case record so demonstrates. Case No. 15-21424, CM-ECF Doc. No. 20, at 5; see Case No. 15-21424, CM-ECF Doc. No. 1, at 18–20.

Federal Rule of Bankruptcy Procedure 3002 governs the timely filing of claims. See 11 U.S.C. §502(b)(9); see also *In re Pajian*, 785 F.3d 1161, 1163–65 (7th Cir. 2015); *In re Greenig*, 152 F.3d 631, 634 (7th Cir. 1998); 4 *Collier On Bankruptcy* ¶523.09[3][a] (Richard Levin & Henry J. Sommer eds., 16th ed. 2018). In 2015, when the Jakubiaks commenced their case, Rule 3002(c) provided in relevant part that "[i]n a chapter 7 liquidation . . . a proof of claim is timely filed if it is filed not later than 90 days after the first date set for the meeting of creditors called under § 341(a) of the Code". Fed. R. Bankr. P. 3002(c) (2014).

Jakubiak admits that Schouten did not have notice or actual knowledge of the Jakubiaks' case "in time to permit timely filing of a proof of claim". See CM-ECF Doc. No. 1, ¶¶ 94; 124–127; CM-ECF Doc. No. 4, ¶¶ 47; 60–61. Even if all that Jakubiak means by this is that Schouten did not have notice or actual knowledge of the bankruptcy before the 90-day period stated in Federal Rule of Bankruptcy 3002(c) ended, §523(a)(3) excepts Jakubiak's debt to Schouten from discharge if the general deadline set forth in Rule 3002(c) controls.

a

Rule 3002(c)'s general deadline, though, is subject to several exceptions, one of which, Rule 3002(c)(5), applies in so-called no-asset cases under chapter 7, like the Jakubiaks' case. Rule 3002(c)(5) states that when the bankruptcy clerk has given creditors notice "of insufficient assets . . . *and subsequently* the trustee notifies the court that payment of a dividend appears possible," the bankruptcy clerk must "give at least 90 days' notice by mail to creditors of that fact and of the date by which proofs of claim must be filed." Fed. R. Bankr. P. 3002(c)(5) (emphasis added).

By its plain terms, Rule 3002(c)(5) does not apply here—at least, it does not apply *yet*. The bankruptcy clerk sent the Jakubiaks' creditors a no-asset notice, but that notice is merely *necessary* to trigger the exception to Rule 3002(c)'s general deadline for filing proofs of claim, it is not *sufficient*. To activate Rule 3002(c)(5), the trustee must notify the

court that payment of a dividend appears possible, and the clerk must then notify creditors "that payment of a dividend appears possible . . . and of the date by which proofs of claim must be filed." Fed. R. Bankr. P. 3002(c)(5).

In the Jakubiaks' case, the trustee never notified the court that payment of a dividend appeared possible. So Rule 3002(c)(5) has neither required nor authorized the clerk to give creditors notice of a new deadline for filing proofs of claim. By the plain language of Rule 3002(c), therefore, the "time [for] . . . timely filing of a proof of claim" under §523(a)(3) ended 90 days after the March 31, 2015 first meeting of creditors, and has never been expanded by operation of subparagraph (c)(5). Jakubiak, as discussed earlier, has admitted that the 90-day period passed before he either listed or scheduled his debt to Schouten and before Schouten had either notice or actual knowledge of the case. Thus, under a plain reading of Rule 3002(c) and §523(a)(3), Jakubiak's debt to Schouten is excepted from discharge, regardless of whether it is of a kind specified in §523(a)(2), (4), or (6).

b

Courts have eschewed this plain reading. They largely disregard the text of Rule 3002(c) and reason that the clerk's notice of no assets means that there is no deadline to file proofs of claim unless the clerk sets a deadline under Rule 3002(c)(5). E.g., *Stucker v. Cardinal Bldg. Materials, Inc. (In re Stucker)*, 153 B.R. 219, 221 (Bankr. N.D. Ill. 1993) ("In a no asset case," if "a no asset notice has been sent out", then "there can never be a time when it is too late to permit the timely filing of a proof of claim", unless "assets of the bankruptcy estate are ever found upon which dividends can be paid," in which case "a new notice will be sent advising of a claims bar date and directing that proofs of claim be filed prior thereto."); *In re Mendiola*, 99 B.R. 864, 867 (Bankr. N.D. Ill. 1989) ("[T]here is no time limit on the filing of proofs of claim in no-asset Chapter 7 cases."); *In re Karamitsos*, 88 B.R. 122, 123 (Bankr. S.D. Tex. 1988) ("[I]n a no asset Chapter 7 case, there is never a claim filing period."); *In re Padilla*, 84 B.R. 194, 195 (Bankr. D. Colo. 1987) (In

"a 'no-asset' Chapter 7 case, the time for filing a claim . . . never . . . expire[s] unless some non-exempt assets are discovered."); see also, e.g., *Beezley v. California Land Title Co. (In re Beezley)*, 994 F.2d 1433, 1436 (9th Cir. 1993) (O'Scannlain, J., concurring) ("The critical point here is that in most cases filed under Chapter 7 . . . , 'the date to file claims is never set . . . .'" (quoting *Advent Mold, Inc. v. Walendy (In re Walendy)*, 118 B.R. 774, 775 (Bankr. C.D. Cal. 1990)); *In re Candelaria*, 121 B.R. 140, 144 (E.D.N.Y. 1990) ("[I]n a no asset Chapter 7 case, the time for filing a claim . . . . remains open indefinitely until non-exempt assets are found."); *In re Corgiat*, 123 B.R. 388, 389 (Bankr. E.D. Cal. 1991) ("The exception has now subsumed the general rule, so that in most cases there is no time limit . . . set by the Clerk's office for creditors to file their proofs of claim.").[3]

The primary consequence of this view is that courts generally treat §523(a)(3) as *not* applying to no-asset debtors' "garden-variety" debts—that is, debts that are *not* of a type specified in §523(a)(2), (4), or (6)—even if the debtor knowingly fails to list or schedule the debt. E.g., *Mendiola*, 99 B.R. at 867 ("Section 523(a)(3)(A) is not applicable in a no-asset case, because there can never be a time when it is too late 'to permit timely filing of a proof of claim.'"). And achieving this outcome by reading Rule 3002(c)(5) to eliminate the deadline by which creditors must file proofs of claim leads to peculiar

---

[3] Official Form 309A, effective December 1, 2015, is titled "Notice of Chapter 7 Bankruptcy Case—No Proof of Claim Deadline", available at http://www.uscourts.gov/forms/meeting-creditors-notices/notice-chapter-7-bankruptcy-case-no-proof-claim-deadline-individuals (last visited Sept. 28, 2018). "Official Bankruptcy Forms are approved by the Judicial Conference and must be used under Bankruptcy Rule 9009." *Id.* This might suggest that the Judicial Conference has endorsed the construction of the Rules discussed above, but the committee notes on the title change to that and other related forms state: "The four versions of the form for chapter 7 cases have been renamed to state *whether the notice specifies a deadline* for filing proofs of claim, rather than whether the case is an 'asset' or 'no-asset' case." Official Form 309 committee notes for 2015 (emphasis added), available at http://www.uscourts.gov/forms/meeting-creditors-notices/notice-chapter-7-bankruptcy-case-no-proof-claim-deadline-individuals (last visited Sept. 28, 2018). In other words, Form 309A's title does not establish that there *is* no proof of claim deadline; it simply indicates that the *form* does not specify one. Notably, however, if there is no applicable exception from Rule 3002(c)'s general deadline, as the discussion above suggests, the form does not provide the notice of the claims-filing deadline as required by Rule 2002(f)(3).

results. For example, in a no-asset chapter 7 case in which payment of a dividend never appears possible, each unscheduled garden-variety debt *is excepted* from discharge until the moment the creditor gets notice of the bankruptcy case, at which point it is discharged. Recall §523(a)(3)'s text: all unscheduled debts are excepted from discharge *unless* the creditor has notice or actual knowledge of the bankruptcy case in time to file a timely proof of claim. If a debt is never scheduled and there is no deadline to file a proof of claim, then the debt is discharged at the instant the creditor learns of the case. Until then, however, §523(a)(3) excepts the debt from discharge because the debt is not scheduled and the creditor lacks notice or knowledge of the case "in time" to file a claim. A no-asset debtor can thus discharge omitted garden-variety debts simply by informing creditors months or years after the case closes that the debtor received a bankruptcy discharge.

For the most part, courts do not acknowledge these oddities, though the Sixth Circuit did in *Zirnhelt v. Madaj (In re Madaj)*:

> In a Chapter 7 no-asset case, . . . the creditors cannot recover from the estate because there is nothing to recover. For this reason, there is no deadline for filing a timely proof of claim in a no-asset case. Technically speaking, therefore, no matter when the creditor learns of the bankruptcy, he is able to file a timely claim. Because § 523(a)(3)(A) excepts the unscheduled debt from discharge "unless such creditor had notice or actual knowledge of the case in time for such timely filing," **the moment the creditor receives notice or knowledge of the bankruptcy case, § 523(a)(3)(A) ceases to provide the basis for an exception from discharge**. Consequently, the debt is at that point discharged.

149 F.3d 467, 470 (6th Cir. 1998) (emphasis added). *Madaj* explains that, while this "result may seem strange at first blush, . . . it makes sense [given] . . . the type of debt involved and the nature of a no-asset case." *Id.*

But any "sense" one can make of this conclusion that unscheduled garden-variety debts are discharged notwithstanding §523(a)(3) relies solely on policy

preferences and presumptions about statutory purpose, rather than text. *Madaj*, for example, is typical in presuming that §523(a)(3)(A)'s purpose is limited to protecting creditors' rights to receive assets from the bankruptcy estate and ruling that this purpose should control §523(a)(3)(A)'s application:

> [T]here are no proceeds to be distributed to the creditors in a no-asset case, which renders the notice function served by the scheduling of debts far less important. **For precisely this reason, there is no deadline for the filing of proofs of claim in a no-asset case**. For the most part, creditors in a no-asset case do not stand to gain by having their debts scheduled, nor do they stand to lose by having their debts omitted from the schedules. Thus, it should come as no surprise that the exception contained in § 523(a)(3)(A)—**designed as it is to prevent an ignorant creditor from suffering an unjust loss by having a debt discharged without his knowing it**—operates differently in no-asset cases where there is little risk that a creditor will suffer a disadvantage resulting from an unscheduled debt.

*Madaj*, 149 F.3d at 470 (emphasis added).

If the Code and the Rules were written so that "there is no deadline for the filing of proofs of claim in a no-asset case", this explanation as to *why* would, perhaps, be convincing. *Id.* But, as already explained, the Code and the Rules are not so written. Rule 3002(c) provides a claims-filing deadline for all chapter 7 cases. Rule 3002(c)(5) does not alter that deadline in no-asset cases until the trustee reports that there likely are assets to be distributed and the clerk sets a superseding deadline. The Rules also expressly prohibit expanding the claims-filing deadline for reasons not provided in Rule 3002(c). Fed. R. Bankr. P. 9006(b)(3).

c

Even assuming that statutory purpose, rather than text, controls, §523(a)(3)'s history suggests that it was designed for a purpose other than, or in addition to, the purpose cited by the *Madaj* court and others (that is, to protect "ignorant creditor[s] from suffering . . . unjust loss[es]"). *Madaj*, 149 F.3d at 470. Section 523(a)(3) of the 1978 Bankruptcy Code is largely derived from §17a(3) of the Bankruptcy Act of 1898. Both of

these provisions reflect a significant change from the Bankruptcy Act of 1867. Act of Mar. 2, 1867, ch. 176, 14 Stat. 517. The Bankruptcy Act of 1867 allowed a debtor to discharge all "provable claims", even if the debtor inadvertently failed to schedule the debt:

> Under the bankruptcy act of 1867, creditors who had provable claims were barred by the bankrupt's discharge, although such creditors' names were omitted from the schedules or so incorrectly given that they had no actual notice of the bankruptcy proceedings, unless the omission or incorrect statement was fraudulent or intentional.

*Kreitlein v. Ferger*, 238 U.S. 21, 35 (1915) (Day, J., dissenting) (internal citation omitted); see also *Lamb v. Brown*, 14 F. Cas. 988, 989 (D. Ind. 1875) (No. 8,011) ("[T]he [1867] act does not contemplate complete schedules in all cases, and yet it declares that the discharge shall release the bankrupt from all debts, etc., which were, or might have been proved against his estate" unless a creditor successfully "contest[s] the validity of [the] discharge on the ground that it was fraudulently obtained.").

Congress took a different approach in the Bankruptcy Act of 1898. Section 17a(3) of the 1898 Act provided: "A discharge in bankruptcy shall release a bankrupt from all of his provable debts, except such as . . . have not been duly scheduled in time for proof and allowance, . . . unless such creditor had notice or actual knowledge of the proceedings in bankruptcy". Act of July 1, 1898, §17a(3), ch. 541, 30 Stat. 544, 550. A few years later, in *Birkett v. Columbia Bank*, 195 U.S. 345 (1904), the Supreme Court explicated what is obvious from the text—that §17a(3) "attache[d] a *punitive* consequence" to a bankrupt's neglect of his duty under §7a(8) of the Act to schedule his creditors. *Id.* at 349 (emphasis added). Section 7a(8)'s provision requiring the debtor to schedule his creditors and §17a(3)'s related "punitive" language remained essentially unchanged for more than seven decades after the Court's decision in *Birkett*.

In 1978, Congress passed the Bankruptcy Reform Act, reenacting title 11 of the United States Code and creating the modern Bankruptcy Code. Pub. L. No. 95-598,

92 Stat. 2549. The 1978 Code contained the language of §523(a)(3) at issue here. The reports submitted by the Senate and House Committees on the Judiciary state that §523(a)(3) was "derived from section 17a(3), follows current law, but clarifies some uncertainties generated by the case law construing 17a(3)." S. Rep. No. 95-989, at 78 (1978); H.R. Rep. No. 95-595, at 364 (1977).[4] According to those reports, §523(a)(3) excepts a debt from discharge "if it was not scheduled in time to permit timely action by the creditor to protect his rights, unless the creditor had notice or actual knowledge of the case." S. Rep. No. 95-989, at 78–79; H.R. Rep. No. 95-595, at 364. If this legislative history suggests anything, it suggests that Congress was concerned that creditors with unscheduled debts would be unable to protect their rights in bankruptcy, so it sought to deter debtors from omitting debts from their schedules by enacting §523(a)(3), which, like §17a(3) before it, "attaches a punitive consequence" to a debtor's failure to file complete and accurate schedules. See *Birkett*, 195 U.S. at 349.

In floor statements in September and October 1978, sponsors of the bankruptcy reform legislation in the House and Senate said that §523(a)(3) was "intended to overrule *Birkett*". 124 Cong. Rec. 32282, 32399 (Sept. 28, 1978) (statement of Rep. Edwards); 124 Cong. Rec. 33872, 33998 (Oct. 5, 1978) (statement of Sen. DeConcini). On its face, this might suggest that Congress, in deriving §523(a)(3) from §17a(3), meant to strip the provision of the "punitive" construction applied to it by the Supreme Court in *Birkett*. But a close reading of *Birkett* and §523(a)(3) suggests an alternative goal.

---

[4] The reports do not explain to what "uncertainties" in the case law they refer, but according to at least one source, "[t]hose 'uncertainties generated by the case law' were, of course, the uncertainties created by *Robinson* [*v. Mann*, 339 F.2d 547 (5th Cir. 1964)]", in which, "[f]lagrantly ignoring *Birkett*, the Fifth Circuit held that schedules could be amended *nunc pro tunc* in extraordinary circumstances that appealed to the equitable discretion of the bankruptcy court . . . ." Lauren A. Helbling & Hon. Christopher M. Klein, *The Emerging Harmless Innocent Omission Defense to Nondischargeability Under Bankruptcy Code § 523(a)(3)(A)*, 69 Am. Bankr. L.J. 33, 56–57 (1995). "It was essential to create this legal fiction because *Birkett* left no room for a straightforward recognition of an equitable defense to the Bankruptcy Act's nondischargeability provision." *Id.* at 56 n.118.

In *Birkett*, the Supreme Court considered whether an unscheduled debt of a creditor who did not have notice of the case before the debtor received his discharge was, nonetheless, discharged. *Birkett*, 195 U.S. at 349. The creditor had received notice of the bankruptcy in time to file a claim and in time to move to revoke the discharge; therefore, the debtor argued that the creditor had "actual knowledge of the proceedings in bankruptcy" for purposes of §17a(3). *Birkett*, 195 U.S. at 349–50 (quoting §17a(3), 30 Stat. at 550). In rejecting that argument, the Court reasoned that "knowledge of the proceedings in bankruptcy" entailed more than knowledge of the opportunity to file a claim:

> Actual knowledge of the proceedings, contemplated by [§17a(3)] is a knowledge in time to avail a creditor of the benefits of the law,—in time to give him an equal opportunity with other creditors,—not a knowledge that may come so late as **to deprive him of participation in the administration of the affairs of the estate,** *or* **to deprive him of dividends**.

*Id.* (citation omitted) (emphasis added).

In "overruling" *Birkett*, Congress took the vague language of §17a(3)—excepting from discharge debts "not . . . duly scheduled in time for proof and allowance, . . . unless [the] creditor had notice or actual knowledge of the proceedings in bankruptcy"—and replaced it with the clearer language of §523(a)(3), which excepts from discharge debts "neither listed nor scheduled . . . in time to permit . . . timely filing of a proof of claim and", if applicable, "timely request for a determination of dischargeability . . . , unless [the] creditor had notice or actual knowledge of the case in time for such timely filing and request". Compare §17a(3) (last codified at 11 U.S.C. §35(a)(3) (1976)), with 11 U.S.C. §523(a)(3) (1982). The clearest inference that arises from this change, given the legislative history, is that Congress meant to displace *Birkett*'s holding that an unscheduled debt can only be discharged based on the creditor's actual knowledge of the bankruptcy case if the creditor learned about the case "in time to give him an equal opportunity with other creditors" to "avail [himself] of the benefits of the

law". See *Birkett*, 195 U.S. at 350. Congress chose, instead, to permit the discharge of an unscheduled debt based on the creditor's actual knowledge of the case so long as the creditor knew about the case in time to meet certain deadlines broadly imposed upon creditors in a bankruptcy case—namely, the proof-of-claim deadline and the deadline to request a determination that a debt is of a kind excepted from discharge by §523(a)(2), (4), or (6).

Nothing about §523(a)(3) itself or the relevant legislative history indicates that Congress meant for that provision to not "attach[] a punitive consequence" to a debtor's "neglect of [his] duty" to schedule his debts and list his creditors fully and accurately, as required by the Code, just like its predecessor, §17a(3), did. See *id.* at 349. A debtor's duties under the Code, as *Birkett* observed, are "all directed to the purpose of a full and unreserved exposition of his affairs, property and creditors." *Id.* That purpose is no less significant in a no-asset case than it is in any other bankruptcy case. In fact, that purpose may be *more* significant in a no-asset case because "no asset claims are easy to make; a creditor might want notice precisely to argue that there are assets even though the debtor asserts otherwise." *Colonial Sur. Co. v. Weizman*, 564 F.3d 526, 532 (1st Cir. 2009). Thus, there is no historical reason why §523(a)(3) should be understood to operate differently depending on whether the debtor's case lacks assets to distribute to creditors.

This is not to say that Congress designed §523(a)(3) to serve a single purpose or that the provision does not also serve to protect the right of creditors to file proofs of claim, as identified by *Madaj* and other decisions. Rather, the foregoing historical analysis shows that, even if one accepts the argument that courts can and should depart from the text of the Code and the Rules to advance some perceived underlying legislative purpose, that argument does not necessarily support the conclusion that there is no deadline for timely filing proofs of claim in all no-asset cases. The history of §523(a)(3)'s discharge exception, which dates back to the late 19th century, suggests that

the exception was written to serve at least one purpose that is no less salient in no-asset cases and, thus, that §523(a)(3) should not operate any differently in such cases except to the extent actually stated in the text of the Code and the Rules.

2

Jakubiak argues that, whatever conclusions one may draw from the preceding analysis, binding circuit precedent provides that §523(a)(3) does not except his debt to Schouten from discharge. He specifically relies upon *Stark v. St. Mary's Hospital (In re Stark)*, 717 F.2d 322 (7th Cir. 1983) (per curiam).[5] *Stark*'s meaning and precedential effect, however, are far from pellucid.

a

The Starks filed a chapter 7 case soon after receiving medical care from St. Mary's Hospital. *Id.* at 322. They did not schedule their debt to St. Mary's, contending later that they believed that the hospital bill was covered by insurance. *Id.* at 322–23. About a year after the bankruptcy court granted the Starks a discharge, St. Mary's obtained a judgment against the Starks for the unpaid services. *Id.* Then, according to the parties' stipulated facts, "the Starks filed a Motion for Relief under 28 U.S.C. 60 [read: Federal Rule of Civil Procedure 60] with the Bankruptcy Court and sought to have their estate reopened in order that the Hospital's debt could be added and subsequently discharged." *Id.* at 323; see also *Stark v. St. Mary's Hospital (In re Stark)*, 26 B.R. 178, 179 n.1 (C.D. Ill. 1982) (quoting Fed. R. Civ. P. 60(b)). The bankruptcy court denied the motion to reopen. 717 F.2d at 323.

The district court reversed the bankruptcy court's ruling, holding that, "in a no asset case where a creditor can be restored to the same status he would have occupied if he had been listed, the debtor should be allowed to amend". 26 B.R. at 180. The district

---

[5] The Seventh Circuit originally issued the *Stark* decision as an unpublished order under Circuit Rule 35. *Id.* at 322 n.*.

court reasoned that the Starks' other creditors had received nothing more than the clerk's no-asset notice under then–Bankruptcy Rule 203(b).[6] 26 B.R. at 180. As a result, the court concluded that "the time for filing a claim [had] not passed", as "any creditor could file a claim if assets were discovered by the trustee", and St. Mary's was "no different than any other creditor" in that regard. *Id.*

The district court also considered the Starks' apparent good faith—that is, that the Starks inadvertently, as opposed to fraudulently or intentionally, omitted St. Mary's from their schedules. It reasoned "that a bankruptcy court is essentially a court of equity" and "[i]ts equitable powers should be exercised with respect to substance and not technical considerations that will prevent substantial justice." 26 B.R. at 180 (citing *Kenneally v. Standard Elecs. Corp.*, 364 F.2d 642, 647 (8th Cir. 1966)). The district court then concluded, "For substantial justice to be done in the circumstances shown . . . , a debtor should receive all of the benefits the Bankruptcy Code offers them." *Id.* The district court reversed the bankruptcy court's order as "contrary to the goal of substantial justice". *Id.*

The Seventh Circuit restated the district court's findings and conclusions, including its invocations of equity, and bluntly declared, "We agree with the district court." 717 F.2d at 323–24. The Seventh Circuit reported that St. Mary's argued on appeal "that even if the estate [were] reopened and assets should later become available from which a dividend might be paid, the Hospital would be precluded from filing a claim because of the six[-]month statute of limitations" then in place under Rule 302(e). *Id.* at 324.[7] The court seems to have rejected this argument based on then-Rule 302(e)(4), which provided an exception to the general deadline for filing proofs of claim

---

[6] Rule 203(b), as applied by the courts in *Stark*, is essentially equivalent to today's Rule 2002(e). Compare 717 F.2d at 323 n.2, with Fed. R. Bankr. P. 2002(e).

[7] Rule 302(e), as applied by the courts in *Stark*, is essentially equivalent to today's Rule 3002(c). Compare *id.* at 323 n.2, with Fed. R. Bankr. P. 3002(c).

substantially similar to the exception now set forth in Rule 3002(c)(5)—that is, if the trustee reports a discovery of distributable assets, the clerk will give creditors notice of that fact and a deadline by which to file claims. 717 F.2d at 324. Under Rule 302(e)(4), the Seventh Circuit noted, "if assets are found and a payment of dividend appears possible the creditors are to be notified and granted a reasonable time to file their claims." *Id.* The Seventh Circuit also acknowledged another argument that St. Mary's raised—that the bankruptcy court "properly ruled that the Starks failed to meet the requirements of [§]523(a)(3)"—but did not address it, other than to state that "the right of the creditor that is protected by [§]523(a)(3) is the right to timely file a proof of claim." *Id.* at 323–24. The court concluded that St. Mary's would be able to file a proof of claim "should subsequent assets be found," and that, in the meantime, "it is unnecessary to file a claim". *Id.* at 324. Based on this and its professed agreement with the district court, the Seventh Circuit affirmed the district court's order that the bankruptcy court's refusal to reopen the case was in error. *Id.*

b

Although the *Stark* decisions span only about three pages in the reporters, they are a morass. Subsequent decisions have only exacerbated their abstruseness.

For example, courts have cited *Stark* in support of the notion, discussed above, that, in general, "there is no time limit on the filing of proofs of claim in no-asset Chapter 7 cases." E.g., *Mendiola*, 99 B.R. at 867 (citing *Stark*, 717 F.2d at 324, among other decisions). But *Stark* doesn't say that. While the district court in *Stark* concluded that "the time for filing a claim [had] not passed", 26 B.R. at 180, and the Seventh Circuit echoed that premise (though, without plainly adopting it), 717 F.2d at 323–24, neither court construed the Code or Rules to provide for an indefinite filing period in no-asset cases. Rather, the *Stark* decisions seem to concede implicitly that the initial period for timely filing of proofs of claim had ended. They were not concerned by that fact because "it is unnecessary" for a creditor to file a proof of claim at the outset of a no-asset case

and reopening the case to allow the Starks to amend their schedules ensures that St. Mary's will receive the clerk's notice of possible dividend and "a reasonable time to file [its] claim[]" if assets are ever discovered. 717 F.2d at 324; 26 B.R. at 180. In other words, "should subsequent assets be found, the Hospital *will have* the opportunity to file a claim", 717 F.2d at 324 (emphasis added), even though it cannot do so in the meantime because the initial filing period has ended.

Courts have also read *Stark* to affirm a purpose-driven reading of §523(a)(3). These courts note the Seventh Circuit's conclusion in *Stark* that "the right of the creditor that is protected by [§]523(a)(3) is the right to timely file a proof of claim", *id.*, and infer from that language that §523(a)(3) must serve no purpose *other than* to protect "the creditor's right to file a proof of claim." E.g., *Mendiola*, 99 B.R. at 866 (citing *Stark*, 717 F.2d at 324). Because "a proof of claim . . . in a Chapter 7 case" serves only as "the creditor's assertion of a right to participate in the distribution of the assets of the estate", such courts reason, "[i]n a case without assets to distribute the right to file a proof of claim is meaningless and worthless." *Id.* at 867. That §523(a)(3) serves *a* purpose of protecting creditors' rights to file a timely proof of claim, however, does not mean that it does not serve other bankruptcy purposes. As discussed above, the history of §523(a)(3) suggests that it also serves to incentivize debtors to schedule their creditors and debts completely and accurately by punishing debtors who neglect their duty under the Code to do so. This purpose is not tied to a creditor's right to file a proof of claim, so *Stark*'s language does not preclude §523(a)(3)'s application in no-asset cases where an unscheduled creditor would have nothing to gain by filing a proof of claim.

Further, courts have read *Stark* to provide that a debtor can move to reopen a closed no-asset case and amend his schedules to add previously unlisted or incorrectly listed creditors, thereby discharging initially unscheduled debts, at least where "the error in the original schedules was a result of mistake or inadvertence and not because of any fraud by the debtor." E.g., *In re Beshensky*, 68 B.R. 452, 453–55 (Bankr. E.D. Wis.

1987). The Seventh Circuit in *Stark* did not expressly hold that reopening a case and amending the schedules discharges a previously unscheduled debt, but that is likely the outcome the court contemplated. See 717 F.2d at 323 (quoting the parties' statement of the case, which provided that the Starks moved to reopen their bankruptcy case "in order that the HOSPITAL's debt could be added and subsequently discharged"); *id.* at 324 (affirming the district court's order reversing the bankruptcy court's denial of the Starks' motion to reopen their case).

Yet, it is difficult to discern how reopening a closed case to schedule an omitted debt would affect the debt's dischargeability. On the one hand, if there is no deadline for filing proofs of claim in a no-asset case, as many courts maintain, then an unscheduled debt is discharged the moment the creditor learns about the bankruptcy case—because the unscheduled debt is excepted from discharge by §523(a)(3) unless (or until) the creditor learns of the bankruptcy in time to file a proof of claim, viz., before the end of infinity. Under this view, it is the creditor's knowledge of the bankruptcy that removes §523(a)(3)'s discharge exception without regard to whether the debtor ever amends filings to add an unscheduled debt or unlisted creditor. Conversely, if Rule 3002(c)'s deadline for filing proofs of claim applies in no-asset cases and that deadline has passed by the time the debtor moves to reopen to amend schedules, scheduling the debt will not affect application of §523(a)(3)'s discharge exception, since the debt would not have been scheduled "in time to permit . . . timely filing of a proof of claim". Again, reopening and amending schedules would serve no purpose (unless undisclosed assets are later discovered and the clerk gives notice of a claims-filing deadline under Rule 3002(c)(5)).[8]

---

[8] Amending the schedules to add omitted creditors only has a benefit if previously unadministered assets are later made available for distribution to creditors who file proofs of claim. Once a bankruptcy case closes, all assets the debtor has scheduled are deemed abandoned by the estate. See 11 U.S.C. §554(c). Thus, only if the debtor failed to schedule assets that he cannot exempt, might an unscheduled creditor receive a benefit from being scheduled after the court closes the bankruptcy case.

c

The Seventh Circuit's own references to and discussions of *Stark*, sparse as they are, perhaps provide some greater clarity about its scope and meaning.

The Seventh Circuit first cited *Stark* in *In re Shondel*, 950 F.2d 1301 (7th Cir. 1991), in which the court considered "whether a bankruptcy case may be reopened and the permanent injunction under 11 U.S.C. § 524 modified to permit recovery from the debtor's insurer." *Id.* at 1303. Early in its decision in *Shondel*, the Seventh Circuit noted that "equitable considerations . . . . led [the] Court in *Stark* to favor a broad policy of reopening". *Id.* at 1304 (citing 717 F.2d at 324). The *Shondel* court also reiterated *Stark*'s assertion, borrowed from pre-Code case law, that "a bankruptcy court exercises equitable powers and . . . should emphasize 'substance and not technical considerations that will prevent substantial justice.'" *Id.* at 1305 (quoting 717 F.2d at 323). Applying *Stark* and other cases, *Shondel* concluded, among other things, that "the equities . . . favor[ed] reopening" the case "in the interest of 'substantial justice.'" *Id.* at 1306. *Shondel* is largely inapposite here, but it does suggest that *Stark* is best understood as founded in equitable, rather than textual, terms.

The Seventh Circuit next cited *Stark* in *Gagan v. American Cablevision, Inc.*, 77 F.3d 951 (7th Cir. 1996), a civil case in which an individual investor "in a cable television limited partnership" sued "14 individuals, corporations, and limited partnerships alleging claims under the federal Racketeer Influenced and Corrupt Organizations Act (RICO) and other claims under state law." *Id.* at 954 (citation omitted). One of the defendants, "Hans D. Theurer, who proceeded at trial *pro se*, challenge[d] . . . the [trial] court's refusal to grant him leave to plead the affirmative defense of discharge in bankruptcy." *Id.* at 955. Theurer had "filed for bankruptcy in the Central District of California" and received a discharge years earlier. *Id.* at 967. The Seventh Circuit affirmed the district court's order denying Theurer's motion to amend his answer on "the eve of trial" to plead his affirmative defense of discharge. *Id.* at 968.

The Seventh Circuit noted that "Theurer's purported defense of discharge was insufficient as a matter of law" because his "bankruptcy court schedule of creditors[] did not list Gagan as a creditor" and nothing in the record otherwise established that Gagan had "notice or actual knowledge . . . of Theurer's bankruptcy proceeding. . . . until after the . . . discharge order". *Id.* Thus, the court concluded, "that order did not discharge Theurer's debt". *Id.* (citing §523(a)(3)(B)).

The court then discussed *Stark*, which Theurer cited "for the proposition that since his was a 'no asset' case he [could] reopen his bankruptcy, amend his schedules to list Gagan, and thus obtain a discharge of the debt to the plaintiff." *Id.* The court distinguished *Stark*, explaining that relief under *Stark* is only available "where there [is] no evidence of fraud or intentional design and the creditor was not harmed in any way" and that, in any event, a debtor seeking relief under *Stark* "must look first to the bankruptcy court", like the Starks did. *Id.* The court then stressed that, "[c]ontrary to Theurer's assertion, it was his responsibility, not the bankruptcy or district courts', to give Gagan notice of his bankruptcy and to properly list Gagan on his schedule of creditors." *Id. Gagan*'s discussion of *Stark* is brief, but it too highlights the equitable considerations at the root of the *Stark* decisions. That it also emphasizes a debtor's duty to fully and accurately list his creditors, perhaps, suggests that *Stark* should not be understood to read a "punitive consequence" out of §523(a)(3) entirely.

The Seventh Circuit most recently cited *Stark* in *Tidwell v. Smith (In re Smith)*, 582 F.3d 767 (7th Cir. 2009). The debtor in that case, Bruce Smith, filed a chapter 7 petition but did not schedule two creditors or the nonpriority unsecured debts he owed to them. *Id.* at 769. The unscheduled debts were for ongoing lawsuits the creditors had filed against Smith in state court for sexual assault. *Id.* Neither creditor received notice of the bankruptcy case, and their counsel only learned about it a few weeks before Smith's discharge. *Id.* The creditors asked the bankruptcy court to declare Smith's debts to them excepted from the discharge under §523(a)(3)(B) because the underlying debts

were "of a kind specified" in §523(a)(6), which excepts from discharge debts "for willful and malicious injury". *Id.* "The [bankruptcy] court found that Smith had deliberately and fraudulently failed to schedule the [debts] and that [the creditors'] counsel had not been put on notice of the bankruptcy in time . . . to permit them to seek a declaration of nondischargeability prior to Smith's discharge." *Id.* at 769–70.

On appeal, Smith disputed the lower court's finding that he had intentionally omitted the creditors from his bankruptcy schedules. The Seventh Circuit ruled that whether the omission was intentional or inadvertent made no difference:

> All that need be shown to establish a right to relief under [§]523(a)(3)(B) is that the debt in question was unscheduled and the creditor did not have notice or actual knowledge of the bankruptcy in time to file a claim and a request for a determination that the debt was nondischargeable. **Whether or not the debtor's failure to schedule the debt was deliberate is irrelevant**.

*Id.* at 777 (emphasis added) (citations omitted). In a footnote to this discussion, the court observed that *Stark*, like decisions from "a number of [other] courts," indicates that "the debtor's mental state may be relevant to the question of whether an unscheduled debt that was otherwise dischargeable under [§]523(a)(3)(A) was, in fact, discharged." *Id.* at 778 n.4. The court suggested that *Stark* is limited to nondischargeability of garden-variety debts under §523(a)(3)(A), stating, "[T]he debtor's state of mind is not relevant to whether an unscheduled debt that was otherwise *non* dischargeable under [§]523(a)(2), (4), or (6) was nonetheless discharged pursuant to [§]523(a)(3)(B)." *Id.*

Given that neither §523(a)(3)(A) nor §523(a)(3)(B) refers in any way to inadvertence, intent, or any other degree of culpability, there is no textual basis for concluding that the application of *either* subparagraph depends on the debtor's mental state. And the two provisions contain substantially identical text. If the debtor's mental state is relevant (or irrelevant) to one, it must be relevant (or irrelevant) to the other, as well. *Smith*'s contrary assertion is inscrutable, at least as a textual matter.

d

Considering all of this, *Stark* seems best conceived as recognizing and applying an equitable exception to §523(a)(3)(A). So conceived, *Stark* means that, in a no-asset case under chapter 7 in which the clerk has given creditors notice that they need not file proofs of claim unless the clerk sends subsequent notice, a debtor who fails to list a creditor with a claim for a garden-variety debt (or to schedule such a debt) may reopen his case after discharge and amend his filings to list the omitted creditor (or schedule the omitted debt), thereby placing the debtor and the creditor in the positions they would have occupied had the debtor properly listed the creditor (or scheduled the debt) in the first place, unless the debtor's omission was fraudulent or intentional or the creditor was harmed in some way by the omission. If matters are equitably reset, *Stark* implies that §523(a)(3)(A) does not apply to except omitted garden-variety debts from discharge. This is essentially how the First Circuit characterized *Stark* in *Colonial Surety Co. v. Weizman*:

> In *Stark*, the holding was that . . . a no asset debtor could, long after the discharge, ask the bankruptcy court to reopen the proceeding to list belatedly a creditor who was innocently omitted and who would have received no benefit from notice. But such a course properly leaves the burden on the debtor to show that the law and equities justify this relief—absent which the debt will remain undischarged.

564 F.3d at 532 (citation omitted).

If *Stark* is premised upon recognition and application of an equitable exception to §523(a)(3)(A), notwithstanding that the exception contradicts, or minimally finds no support within, the text of the Code and the Rules, its reasoning has been undermined by more-recent precedent. The Supreme Court has "long held that 'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code." *Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014) (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)). And the Seventh Circuit

has unequivocally stated, "Courts lack an 'equitable' power to contradict the bankruptcy statutes and rules." *Netzer v. Office of Lawyer Regulation*, 851 F.3d 647, 649 (7th Cir. 2017).

What is more, if *Stark* is understood to contemplate discharge of debts owed to creditors who did not receive any pre-discharge notice of the bankruptcy case, it seems in tension with the Constitution's guaranty of due process, which "at a minimum . . . require[s] that deprivation of . . . property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case". See *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950); see also *id.* at 315 (explaining that the "right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest."); see also *Bank of Marin v. England*, 385 U.S. 99 (1966); *City of New York v. N.Y., New Haven & Hartford R.R. Co.*, 344 U.S. 293 (1953).

Even a garden-variety debt is a protected property interest. See *Mullane*, 339 U.S. at 313–14; see also *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 485 (1988) ("unsecured claim" for unpaid medical expenses "is properly considered a protected property interest"). And, even if a creditor to whom the debtor owes a garden-variety debt will not receive any distribution from a no-asset bankruptcy case, the creditor is entitled to notice of the proceedings so that it can decide whether to participate in them—after all, if the court grants the discharge, the creditor will be enjoined from collecting the debt from assets the debtor might acquire *after* bankruptcy. See 11 U.S.C. §524(a); see also *In re Boomgarden*, 780 F.2d 657, 661 (7th Cir. 1985) ("In bankruptcy proceedings, both debtors and creditors have a constitutional right to be heard on their claims, and 'the denial of that right to them [is] the denial of due process which is never harmless error.'" (alteration in original) (quoting *Republic Nat'l Bank of Dallas v. Crippen*, 224 F.2d 565, 566 (5th Cir. 1955))). It is unsurprising then, that in *Smith*, the Seventh Circuit recognized that "[t]he constitutional mandate of due process does come into

play" when considering "[t]he adequacy of . . . notice" in a no-asset case for purposes of §523(a)(3)(B). 582 F.3d at 778–80.

e

No matter how uncertain *Stark*'s foundation, however, it has not been overruled. And, as "[o]urs is a hierarchical judiciary, . . . judges of inferior courts must carry out [even those] decisions they believe mistaken." *Gacy v. Welborn*, 994 F.2d 305, 310 (7th Cir. 1993). Consequently, Jakubiak's failure to list or schedule his debt to Schouten before Rule 3002(c)(5)'s claims-filing deadline expired did not, as a matter of law, except the debt from discharge by operation of §523(a)(3), even though Schouten was also then unaware of the bankruptcy.

3

That Jakubiak has already amended his schedules to list his debt to Schouten suggests that he has already, in effect, taken the relief to which *Stark* could have arguably entitled him. That is, *Stark* seems to posit that a debtor's post-closure amendment of his schedules to include omitted debts somehow renders those debts discharged, notwithstanding §523(a)(3). If that's the case, then Jakubiak has already rendered his debt to Schouten discharged merely by amending his schedules, so long as Jakubiak's is a garden-variety debt (a topic to which this decision returns momentarily).

But Jakubiak has not established that he is entitled to *Stark*'s equitable reset of the bankruptcy case. To show that he is entitled to such relief, he must first satisfy his "burden . . . to show that the law and equities *justify* this relief", otherwise his debt to Schouten will remain nondischargeable under §523(a)(3), no matter what "kind" of debt it is. See *Colonial Surety Co.*, 564 F.3d at 532 (emphasis added). As the parties have not meaningfully addressed this issue, neither is entitled to summary judgment on Schouten's §523(a)(3) claims based on *Stark*.

E

Additionally, as noted above, the record clearly shows that Jakubiak's debt to Schouten was neither listed nor scheduled in time to permit Schouten to timely request a determination of dischargeability under §523(a)(2), (4), or (6). Schouten maintains that the debt is "of a kind specified" in either §523(a)(2) or §523(a)(6). If he is right about that, the debt is nondischargeable under §523(a)(3)(B) without regard to *Stark* or the reasons Jakubiak failed to schedule the debt. See *Smith*, 582 F.3d at 777–78 & n.4.

1

Schouten argues that because uncontested facts make Jakubiak's debt to him *potentially* nondischargeable under §523(a)(2) or (6), he is entitled to summary judgment declaring that the debt is nondischargeable under §523(a)(3)(B) without having to establish that the debt actually *is* of a kind specified in §523(a)(2) or (6). CM-ECF Doc. No. 14, at 13. This is contrary to §523(a)(3)(B)'s text, which states that it applies to debts "of a kind specified in paragraph (2), (4), or (6)" of §523(a), rather than to debts *potentially* of a kind specified there.

In making his argument, Schouten relies solely on *In re Guseck*'s statement that debts immune from §523(a)(3) in no-asset cases "include debts that do not arise from *potentially* nondischargeable conduct." *Id.* (quoting *In re Guseck*, 310 B.R. 400, 403 (Bankr. E.D. Wis. 2004)). Schouten does not explicate the bounds of "potentially" nor does he explain why the uncontested facts establish that, as a matter of law, Jakubiak's debt arises out of potentially nondischargeable conduct.

Beyond that, Schouten reads far too much into *Guseck*'s reference to "potentially" nondischargeable conduct. In context, the statement merely distinguishes "garden-variety debts" from debts "potentially nondischargeable" under §523(a)(2), (4), or (6) to explain the court's conclusion that some debts are automatically discharged in a no-asset case even if the debtor fails to schedule them.

*Guseck* further explains that to determine whether an unscheduled debt is

excepted from discharge under §523(a)(3)(B), a court must adjudicate whether the debt is of a type excepted from discharge by §523(a)(2), (4), or (6). *Guseck* concludes that, in "a no-asset, no-bar-date case . . . [a]ny unscheduled debts of the kind described in Bankruptcy Code § 523(a)(2), (4) or (6) have not been discharged, but a declaratory judgment action as to their dischargeability may be brought in this court or the state court." *Guseck*, 310 B.R. at 405. The declaratory-judgment action *Guseck* contemplates is one to determine whether the debt is *actually* of a type made nondischargeable by §523(a)(2), (4), or (6), not one to determine whether the creditor "plausibly" alleges that the debt is of that type. Consequently, Schouten "must prove [his] cause of action under § 523(a)(2), (4), or (6), in order to prevail under § 523(a)(3)." *Urbatek Sys., Inc. v. Lochrie (In re Lochrie)*, 78 B.R. 257, 259–60 (B.A.P. 9th Cir. 1987); see also *Loud v. Richie (In re Richie)*, 380 B.R. 878, 883 (Bankr. M.D. Fla. 2007) ("[Section] 523(a)(3)(B) does not reduce the burden of proof required to establish that a debt is of a kind that would be excepted from discharge under § 523(a)(2), (4) [or] (6)." (quoting *In re Cameron*, 305 B.R. 94, 97 (Bankr. M.D. Fla. 2003)); *First Nat'l Ins. Co. v. Bartomeli (In re Bartomeli)*, 303 B.R. 254, 268 (Bankr. D. Conn. 2004) ("[E]ven in a Section 523(a)(3)(B) context, the creditor must prove the usual elements of nondischargeability under the Fraud Objection or Section 523(a)(4) or (6) (as the case may be)".).

2

Schouten's §523(a)(3)(B) claim depends on establishing that Jakubiak owes him a debt of a kind excepted from discharge by §523(a)(2) or (6)—he does not allege that Jakubiak's debt falls within the scope of §523(a)(4). Each party asserts that he is entitled to summary judgment on Schouten's request to have the debt declared of a kind covered by §523(a)(2) or (6) and, thus, nondischargeable under §523(a)(3)(B).

In connection with Schouten's §523(a)(2) and (6) allegations, the parties' summary-judgment submissions principally restate their preclusion arguments. For the reasons explained above, however, preclusion principles entitle neither side to summary judgment on Schouten's contention that Jakubiak owes him a debt of a kind covered by §523(a)(2) or (6).

3

Jakubiak also claims he is entitled to summary judgment establishing that his debt to Schouten is not of a kind excepted from discharge by §523(a)(2) because (i) that claim depends on allegations that Jakubiak fraudulently omitted material information, and (ii) based on the application of law to uncontested facts, he owed Schouten no duty to disclose the facts on which Schouten would rely to prove fraud. But §523(a)(2)(A) also excepts from discharge debts arising from the debtor's acquisition of property under false pretenses. False pretenses may arise "when a debtor, with the intent to mislead a creditor, engages in 'a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, . . . or understanding of a transaction, in which [the] creditor is wrongfully induced by [the] debtor to transfer property or extend credit to the debtor'". *Attorneys' Title Guar. Fund, Inc. v. Wolf (In re Wolf)*, 519 B.R. 228, 246 (Bankr. N.D. Ill. 2014) (quoting *Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996)). "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." *Id*. (quoting *Baermann v. Ryan (In re Ryan)*, 408 B.R. 143, 157 (Bankr. N.D. Ill. 2009)).

Schouten submitted an affidavit attesting to the facts pleaded in the arbitration complaint. Jakubiak objects to some of the allegations on hearsay and other grounds, but Schouten unquestionably has knowledge of the circumstances surrounding his dealings with Jakubiak. Schouten contends that Jakubiak misrepresented, among other

things, his status as a broker, failed to disclose the disadvantages of the investments Jakubiak recommended, and failed to disclose that FINRA rule 3240 prohibited Jakubiak from soliciting personal loans from Schouten. Schouten has provided deposition testimony that Jakubiak continued to advise him on annuities after 2008 and that Jakubiak never told Schouten that he was fired in 2008. Schouten further testified that had Jakubiak told him that regulations prohibited Jakubiak's loan solicitation, Schouten would have "stopped everything right there", meaning, by reasonable inference, that Schouten would not have loaned Jakubiak $75,000. CM-ECF Doc. No. 22-3, at 2.

These factual contentions are sufficient to raise a genuine dispute as to whether Jakubiak's debt to Schouten arose from false representations or false pretenses. Accordingly, Jakubiak is not entitled to summary judgment on Schouten's §523(a)(3) claim based on Jakubiak's contention that, as a matter of law, Schouten cannot prove that the debt is of a kind specified in §523(a)(2).

V

The court will enter a separate order granting summary judgment to Jakubiak on Schouten's claims under §523(a)(2), (6), and (19) and denying summary judgment to both parties on Schouten's §523(a)(3) claim.


October 1, 2018


G. Michael Halfenger
United States Bankruptcy Judge