THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:

DATED: March 29, 2019



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

    Robert J. Jakubiak and　　　　　　　　Case No. 15-21424-GMH
    Cheryl A. Jakubiak,　　　　　　　　　　　　Chapter 7

        Debtors.

Gilbert Schouten,

        Plaintiff,

    v.　　　　　　　　　　　　　　　　　　Adv. Proc. No. 16-02141-GMH

Robert J. Jakubiak,

        Defendant.

**DECISION**

    Debtor Robert Jakubiak owes Gilbert Schouten a $75,000 judgment debt.

Schouten asks this court to declare that he can collect that debt even though Jakubiak

received a bankruptcy discharge because, according to Schouten, the debt is of a type excepted from discharge by one or more paragraphs of §523(a) of the Bankruptcy Code. 11 U.S.C. §523(a); see also *id.* §§524(a) & 727(b).[1]

Only one of Schouten's claims survived summary judgment—that §523(a)(3) excepts the debt from discharge because Jakubiak neither listed Schouten as a creditor nor scheduled the debt to him in time to permit Schouten to file a proof of claim or commence an adversary proceeding under §523(c). See ECF No. 34.[2] The parties tried that claim to the bankruptcy court.

# I

The bankruptcy court has jurisdiction over this proceeding under 28 U.S.C. §1334 and the Eastern District of Wisconsin's order of reference under 28 U.S.C. §157(a). Order of Reference (E.D. Wis. July 10, 1984), available at http://www.wied.uscourts.gov/local-rules-and-orders. This proceeding to determine the dischargeability of a debt is a core proceeding in which the court may enter final judgment. 28 U.S.C. §157(b)(1) & (2)(I).

The court makes the following findings of fact and conclusions of law.

# II

## A

Schouten retired in the late 1990s and used his retirement funds to purchase an annuity from USG Annuity & Life Company.[3] Around that time, Schouten started bowling with Jakubiak, an insurance agent who, for years before and after meeting Schouten, worked for and sold annuities on behalf of various insurance companies.

In 2005, Schouten became dissatisfied with his USG annuity because the interest

---

[1] All statutory references are to title 11 of the U.S. Code, unless otherwise indicated.

[2] Unless otherwise noted, citations to the record refer to documents filed in this adversary proceeding.

[3] The parties also refer to this annuity as the "ING annuity."

rate declined, so he asked Jakubiak for advice. Jakubiak recommended that Schouten replace his USG annuity with an annuity from Physicians Life Insurance Company. Schouten followed that advice in June 2006. Jakubiak signed the Physicians Life application as Schouten's agent and was paid a commission. About 18 months later, Schouten replaced his Physicians Life annuity with an annuity from American Investors Life Insurance Company, Inc., again following Jakubiak's advice. Jakubiak was the agent of record for the American Investors annuity and was again paid a commission. With each annuity transfer, Schouten incurred a penalty, known as a "surrender charge", for early withdrawal.

In March 2009, based on more advice from Jakubiak, Schouten surrendered his American Investors annuity and in April 2009 replaced it with an annuity from Forethought Life Insurance Company. Schouten incurred another surrender charge. Tim Stout, rather than Jakubiak, signed the Forethought application as Schouten's agent. Jakubiak testified at trial that he and Stout were "friends" who, at times, worked together "selling insurance products" and that Stout acted as Schouten's agent with respect to the Forethought annuity because Jakubiak "wasn't licensed with them." ECF No. 65, at 29:6–:16 & 30:2–:10. When asked about Stout at trial, Schouten testified that he "asked [Jakubiak] why is that guy on my contract as my agent[?], and [Jakubiak] said that he helped with the paperwork and thought probably that his name should be on there." *Id.* at 60:12–:25.

In 2011, Schouten initiated another annuity transfer. In connection with this transfer, Schouten testified that he and Jakubiak "sent . . . paperwork into Forethought" because Jakubiak "wanted [Schouten] to get out of that one [and] into some different one." *Id.* at 64:1–:7. Jakubiak testified, to the contrary, that he did not advise Schouten to transfer his funds from Forethought: "I didn't. That was [Schouten]'s [idea]. He was adamant about having me be the agent of record. And I explained to him that . . . he would be taking a step back. But he was adamant about transferring it." *Id.* at 33:23–

34:3. Regardless of whose idea it was, Schouten canceled the transaction before it was completed.

B

During their bowling-and-business relationship, Jakubiak also borrowed money from Schouten. Between August and December 2008, Jakubiak borrowed money from Schouten three times. He borrowed money from Schouten a final time in November 2009. To make each of these loans, Schouten drew from a home equity line of credit because he had no other ready source of liquid funds, a fact of which Jakubiak was aware.

When asked at trial why he borrowed this money, Jakubiak testified, "To pay taxes and my mortgage. . . . Because I had fallen behind. My income had dropped dramatically." *Id.* at 102:17 & :19–:20. Schouten testified that, in addition to saying that he needed money "for his mortgage" and "something about taxes", Jakubiak commented that "he was in trouble with gambling." *Id.* at 67:5, 67:23 & 68:11–:12.

In total, Jakubiak borrowed $75,000 from Schouten. Before Schouten sued, Jakubiak had made only sporadic payments totaling $338.25. *Id.* at 103:8–:17; ECF No. 42, at 13; ECF No. 45, at 4.

C

In September 2012, Schouten filed a statement of claim with the Financial Industry Regulatory Authority (FINRA) against Jakubiak and Stout—as well as their one-time employer, MML Investors Services, LLC. He alleged fraud, misrepresentation, breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty, among other things, and requested more than $216,000 in damages. FINRA's arbitrator summarized the case in part as follows:

> The causes of action related to Claimant's [i.e., Schouten's] allegation that Jakubiak improperly advised him to transfer various annuities for the sole purpose of generating commissions for Jakubiak. Claimant also alleged that he gave Jakubiak $75,000 in personal loans which have never been repaid.

> Claimant further alleged that Jakubiak and Stout engaged in this annuity flipping strategy after Jakubiak was no longer licensed as a broker and that as a result are responsible for all surrender fees and loss of profits to his account.

Ex. 28, ECF No. 68-27, at 40. Neither Jakubiak nor Stout appeared in the arbitration.

In February 2014, the arbitrator entered an award in Schouten's favor against Jakubiak and Stout based on the following findings:

> Respondent Jakubiak knew, or should have known, that securities law prohibits brokers from borrowing money from clients. Attachments to claim . . . indicate that Respondent Jakubiak personally received four checks from Claimant Schouten without an indicated investment purpose or action for Claimant.
>
> Respondent Stout acted improperly in facilitating Respondent Jakubiak's transferring of Claimant Schouten's annuity amounts. On 12/28/07 Claimant transferred $170,090.50 to American Investors Life Annuity. On 4/1/09 Claimant transferred $153,948.09 from American Investors Life Annuity to Forethought Destination Indexed Annuity. Dollar amount lost in the transfer was $16,142.41.

*Id.* at 41. The award states that Jakubiak "is liable for and shall pay to Claimant $75,000.00" and that Stout "is liable for and shall pay to Claimant $16,142.41". *Id.* The award then states, "All other relief requests are denied." *Id.*

In March 2014, Jakubiak applied to the Wisconsin Circuit Court for Milwaukee County for an order confirming the arbitration award. *Id.* at 44–46; *Schouten v. Jakubiak*, No. 2014CV2297 (Wis. Cir. Ct. Milwaukee Cty. filed Mar. 18, 2014); see Wis. Stat. §788.09. Neither Jakubiak nor Stout appeared in state court. In July 2014, the state court entered an order for default judgment confirming the arbitration award, and, in December 2014, the state court entered judgment against Jakubiak in the amount of $75,000 and against Stout in the amount of $16,142.14, with interest and costs.[4] Ex. 28,

---

[4] This decision largely ignores the interest and costs for ease of discussion.

*supra*, at 47–49.

D

In February 2015, Jakubiak and his wife filed a voluntary petition under chapter 7 of the Bankruptcy Code. The Jakubiaks reported Schouten's judgment against Robert on their statement of financial affairs, but they did not include the debt to Schouten on their schedule of liabilities or list him among their creditors. As a result, the clerk of the bankruptcy court did not serve Schouten with notice of the filing and of the meeting of creditors.

Schouten did not find out about the Jakubiaks' bankruptcy case until after this court granted them a discharge and closed the case in June 2015. When Schouten discovered that Robert Jakubiak had obtained a bankruptcy discharge, he moved to reopen the case and commenced this adversary proceeding against Robert, seeking a determination that Robert's debt to him was excepted from the discharge. As mentioned above, the court granted Jakubiak summary judgment on each of Schouten's claims, except for one: that Jakubiak's debt to Schouten was excepted from the discharge under §523(a)(3) because the Jakubiaks neither listed Schouten as a creditor nor scheduled the debt to him in their bankruptcy case.

III

A

As the summary-judgment decision explains, the undisputed facts—specifically, that the Jakubiaks did not schedule the debt or list Schouten as a creditor before they received a discharge and that Schouten did not have notice of the case in time to file a proof of claim—seem to lead to the indisputable conclusion that the debt was excepted from the discharge, given §523(a)(3)'s text. Section 523(a)(3) states:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt—
>
> . . .

(3) neither listed nor scheduled under section 521(a)(1) . . . in time to permit—

 (A) if such debt is not of a kind specified in [§523(a)(2), (4), or (6)], timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing; or

 (B) if such debt is of a kind specified in [§523(a)(2), (4), or (6)], timely filing of a proof of claim and timely request for a determination of dischargeability of such debt . . . , unless such creditor had notice or actual knowledge of the case in time for such timely filing and request . . . .

Subparagraphs (A) and (B) of §523(a)(3) both except from discharge debts that were not scheduled in time for the creditor to file a timely proof of claim, if the creditor was not listed and was otherwise unaware and not on notice of the case.

 Subparagraph (B) imposes a second time limitation when the unscheduled debt is "of a kind specified in" §523(a)(2), (4), or (6): debts of those types (generally, debts for frauds and intentional harms) are excepted from discharge if the debtor failed to schedule them in time for an unlisted and unaware creditor to request a determination of dischargeability of the debt, as well as to file a proof of claim. Subparagraph (B)'s additional limitation recognizes that debts specified in §523(a)(2), (4) and (6) are excepted from discharge by those paragraphs only if the bankruptcy court determines that the debt is of one of those types on the timely request of the creditor to whom the debt is owed. See §523(c).[5] Section 523(a)(3)(B) thus preserves the nondischargeability of

---

[5] Section 523(c)(1) provides that debts of a type specified in §523(a)(2), (4), or (6) are only excepted from discharge if, "on request of the creditor to whom such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge". To obtain such a determination, a creditor must file "a complaint . . . no later than 60 days after the first date set for the meeting of creditors". Fed. R. Bankr. P. 4007(c) (citing §341(a)). The same filing limitation does not apply with respect to other debts: "a complaint to obtain a determination of the dischargeability of any debt" not of a kind specified in §523(a)(2), (4), or (6) "may be filed at any time." See Fed. R. Bankr. P. 4007(a) & (b).

unscheduled debts arising from certain acts of fraud or willful and malicious injury, for example, when an unlisted creditor to whom such a debt is owed learns of the bankruptcy case too late to make a timely request that the bankruptcy court determine that the debt is excepted from discharge by §523(a)(2), (4), or (6), even when the unlisted creditor learned of the bankruptcy case in time to file a proof of claim.

If, however, the unlisted creditor did not learn of the bankruptcy in time to file a proof of claim, then §523(a)(3), by its terms, excepts the debt from discharge regardless of the type of debt. Both subparagraph (B), which covers debts of the types specified in §523(a)(2), (4), and (6), and subparagraph (A), which covers all other types of debts, contain an identical exception from discharge for unscheduled debts owed to unlisted creditors who do not otherwise have notice or actual knowledge of the case before the deadline for timely filing of proofs of claims passes.

The parties agree that the Jakubiaks did not list Schouten as a creditor or schedule Robert Jakubiak's debt to him and that Schouten had neither notice nor actual knowledge of the case in time to allow him to timely file a proof of claim. See Amended Decision, ECF No. 35, at 22–32. Section 523(a)(3)'s terms would appear, therefore, to except the debt from discharge regardless of whether the debt is of a kind specified in §523(a)(2), (4), or (6). But, as the summary-judgment decision explains, precedent makes the matter less simple.

B

*Stark v. St. Mary's Hospital (In re Stark)* directs that a bankruptcy court may not always apply §523(a)(3) "mechanically". 717 F.2d 322, 323 (7th Cir. 1983) (per curiam). In so directing, *Stark* advances an equitable exception to §523(a)(3), on which Jakubiak relies.

*Stark*, as the summary-judgment decision explains, allowed the equitable exception where (i) notice of the meeting of creditors in a case under chapter 7 included "notice of no dividend" under a predecessor to Federal Rule of Bankruptcy Procedure

2002(e), (ii) the debtor's "failure to schedule the [debt] . . . [and list the] creditor was not the result of fraud or intentional design", and (iii) the omission did not cause the creditor any "genuine harm". *Id.* at 323–24; see Amended Decision, *supra*, at 40. In *Stark*, the court concluded that if these conditions were met, the "debtor may reopen the estate to add an omitted creditor". 717 F.2d at 324.

*Tidwell v. Smith (In re Smith)* cabins *Stark*'s equitable exception to debts **not** of a kind specified in §523(a)(2), (4), or (6). 582 F.3d 767 (7th Cir. 2009). *Smith* declares that for *Stark*'s equitable exception to apply, the "unscheduled debt" must be "otherwise dischargeable under [§]523(a)(3)(A)", rather than "otherwise *non* dischargeable under [§]523(a)(2), (4), or (6)". *Id.* at 778 n.4; see Amended Decision, *supra*, at 38–40. [6]

Reading *Stark* and *Smith* together requires applying §523(a)(3) as follows: If an unlisted creditor with neither notice nor knowledge of the bankruptcy case is owed an unscheduled debt that is covered by §523(a)(3)(A) (i.e., is not for fraud or other intentional harms covered by §523(a)(2), (4) or (6)), then the debt **is** discharged as long as (i) the clerk gave (other) creditors notice that the estate appeared to have no assets from which a dividend could be paid, (ii) the debtor omitted the debt and creditor inadvertently, and (iii) the omission did not harm the creditor. But if the unlisted creditor is ignorant of the case and holds an unscheduled debt that is covered by §523(a)(3)(B) (i.e., **is** for fraud or other intentional harms covered by §523(a)(2), (4) or

---

[6] The circumstances in *Stark* differ from those here: The Starks failed to schedule a hospital bill that they thought their insurance provider would pay. The hospital-creditor did not contend that the debt was excepted from discharge for any reason other than that the Starks failed to schedule it and to list the hospital as a creditor. Accordingly, *Stark* could perhaps be construed to apply, for example, only where a debtor mistakenly omits an otherwise dischargeable debt based on a reasonable and sincere belief that the debt would be paid by a third party. But the Seventh Circuit has discussed *Stark* in broader terms, and *Stark* itself belies such a narrow reading. See, e.g., *Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 968 (7th Cir. 1996) (Under *Stark*, a debtor in "a 'no-asset' case . . . may reopen his bankruptcy [and] amend his schedules" to discharge an unscheduled debt to an unlisted creditor "where there [is] no evidence of fraud or intentional design and the creditor was not harmed in any way.").

(6)), then the debt is **not** discharged, "[w]hether or not the debtor's failure to schedule the debt was deliberate" and without regard to whether the creditor could have benefitted from earlier notice of the bankruptcy case other than by obtaining a determination of dischargeability under §523(a)(2), (4) or (6). *Smith*, 582 F.3d at 777.

The effect of all this for present purposes is that if *Stark*'s equitable exception does **not** extend to the facts of this case, then §523(a)(3) excepts the debt from discharge regardless of whether the debt to Schouten is of a kind specified in §523(a)(2), (4), or (6). Again, no one disputes that Jakubiak did not schedule the debt or list Schouten as a creditor or that Schouten did not receive notice of the case until after the court closed it. But if *Stark*'s exception **does** extend to the facts here, then the debt is discharged **unless** it is of a kind specified in §523(a)(2), (4), or (6). And, if the debt **is** of a kind specified in §523(a)(2), (4), or (6), then it is excepted from discharge by operation of §523(a)(3)(B) even if the Jakubiaks' failure to list Schouten or schedule his judgment debt was inadvertent and Schouten was not harmed by their omission.

IV

A

Before applying these principles, a few observations about the standard and burdens of proof are in order. A creditor seeking a judgment that a debt is excepted from discharge must show by a preponderance of the evidence that the debt is of a kind covered by §523(a). *Grogan v. Garner*, 498 U.S. 279, 291 (1991); see also *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 n.4 (2011).

Schouten bears the ultimate burden to persuade the court that the debt is nondischargeable under §523(a)(3). See *Grogan*, 498 U.S. at 283. Jakubiak, though, bears the more-specific burden of persuading the court that he is entitled to *Stark*'s equitable exception from §523(a)(3)'s text: *Stark* essentially creates an affirmative defense to a §523(a)(3)(A) claim. See *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 477 (7th Cir. 2019) (explaining that "an affirmative defense . . . assumes the plaintiff can prove

everything she must to establish her claim but may still act to defeat her claim"); *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999); ECF No. 45, at 3.

B

To the merits. The court first determines whether *Stark*'s equitable exception to §523(a)(3) applies here if the debt is **not** of a kind specified in §523(a)(2), (4), or (6).

1

Schouten does not dispute that *Stark*'s first condition is met: Jakubiak received a chapter 7 discharge in a "no asset" case. Federal Rule of Bankruptcy Procedure 2002(e) provides that, in a case under chapter 7, "if it appears from the schedules that there are no assets from which a dividend can be paid", then the clerk may include in the notice of the meeting of creditors "a statement to that effect; that it is unnecessary to file claims; and that if sufficient assets become available for the payment of a dividend, further notice will be given for the filing of claims." The clerk's notice of the meeting of creditors in the Jakubiaks' chapter 7 case included such a statement. See *In re Jakubiak*, No. 15-21424 (Bankr. E.D. Wis. Feb. 19, 2015), ECF No. 3, at 2.

2

*Stark*'s second condition is also satisfied. The Jakubiaks' failure to schedule the debt to Schouten or list Schouten "as a creditor was not the result of fraud or intentional design". *Stark*, 717 F.2d at 323. Rather, it was the result of an inadvertent, though careless, error.

As noted above, the Jakubiaks omitted Schouten from their list of creditors and Robert Jakubiak's debt to Schouten from their schedule of liabilities. They did, however, include Schouten's state-court case against Robert on their statement of financial affairs—on the list of lawsuits to which they were parties within the year before filing their bankruptcy case. See Fed. R. Evid. 201; ECF No. 65, at 43:7–:14 & 124:16–125:3. This makes it highly implausible that, as Schouten argues, "leaving [him] off the schedules . . . was . . . done purposely". ECF No. 60, at 8–9. If the Jakubiaks had intended to leave

Schouten out of their bankruptcy filings, it is difficult to imagine why they would have reported his case against Robert on their statement of financial affairs.[7]

Trial testimony clarified how the discrepancy between the statement of financial affairs, on the one hand, and the list of creditors and schedules of liabilities, on the other, arose. Richard Check, the attorney who prepared and filed the Jakubiaks' bankruptcy petition, explained that in preparing the petition he and his staff used what was then "a new software package" that allowed them to "integrate the [debtors'] credit reports into the bankruptcy schedules." ECF No. 65, at 125:8–:12. To generate the schedules, Check's staff ran credit reports for each debtor-client and asked each to write down "[a]ny debt . . . not listed on the credit report". *Id.* at 125:12–:17 (internal quotations omitted). Check explained that, after the staff used this information to draft the schedules, he would "meet with the clients" and "interview them". *Id.* at 126:5–:15. Jakubiak told Check about Schouten's judgment, which was not listed on the credit report. *Id.* at 128:20–129:12. Check entered the judgment, but the software only included it on the statement of financial affairs; it did not also include the debt on the appropriate schedule of liabilities, nor did it include Schouten on the list of creditors. *Id.* at 124:16–127:2.

Check did not notice this error. *Id.* at 126:20–:22. Neither did Jakubiak, who credibly testified at trial that he "inadvertently missed" the omission of Schouten's name from the schedules: he "saw it on other paperwork" and "just assumed [the debt]

---

[7] Identifying Schouten's judgment debt on the statement of financial affairs does not constitute "listing" Schouten or "scheduling" the debt for §523(a)(3) purposes. Section 523(a)(3) covers debts "neither listed nor scheduled under section 521(a)(1) of this title". Section 521(a)(1) requires debtors to file, among other things, "a list of creditors", and, "unless the court orders otherwise", a "schedule of assets and liabilities" and a "statement of the debtor's financial affairs". §521(a)(1)(A), (B)(i) & (iii). The effect of not including a creditor on the list of creditors or the schedules is that the creditor does not receive notice of the bankruptcy filing. See Fed. R. Bankr. P. 2002(g)(2).

was part of the bankruptcy." *Id.* at 43:7–:10. He also testified that he reviewed the "creditor's list" and did not notice that Schouten was missing from that list. *Id.* at 43:15-22.

Schouten argues that Jakubiak left him off the list of creditors and failed to schedule the debt owed to him as part of a "scheme to avoid repaying the . . . debt". ECF No. 60, at 1. But the evidence does not support inferring fraudulent or other bad intent from the omission. Jakubiak credibly testified that he had nothing to gain from omitting Schouten and his debt. *Id.* at 44:23–:24 & 103:25–104:5. Check seconded this testimony. When asked at trial what Jakubiak could have expected to gain from omitting the debt, Check testified, "Nothing. It would have been better if it was listed." *Id.* at 127:21–:24. Schouten has not offered, and the court cannot discern from the evidence, a more convincing answer. Schouten's suggestion that there was a clandestine or improper "scheme" to avoid repaying him is mere speculation. It fails for lack of proof.

Robert Jakubiak testified that he and his wife filed their bankruptcy case "[b]asically *because of* the lawsuit that [Schouten] had filed against [him]". *Id.* at 42:13–:15 (emphasis added). Check corroborated that testimony, explaining that Robert told him "at the beginning" about Schouten's judgment, which, as explained below, is reasonably understood to be dischargeable, "because it was his biggest debt, his major debt." *Id.* at 127:14–:19. Schouten stresses this fact in his post-trial brief, stating that Robert's debt to him was "the single largest unsecured debt that the [Jakubiaks] owed to *any creditor* . . . , by thousands of dollars." ECF No. 60, at 9 (emphasis added). That Schouten's judgment was the Jakubiaks' largest debt makes it implausible, at the least, that the Jakubiaks omitted the debt intentionally. Given that the Jakubiaks filed their bankruptcy case to avoid repaying the debt to Schouten *legally* (by receiving a discharge), there is no sound basis for inferring that they intentionally omitted Schouten and his debt from their list of creditors and bankruptcy schedules.

The Jakubiaks unquestionably failed to perform their duties under §521(a) to schedule Robert's debt to Schouten and list Schouten as a creditor. That failure, though, was the result of careless oversight, not intentional design or fraud.

3

*Stark*'s third condition is also satisfied. Schouten was not genuinely harmed by the Jakubiaks' failure to list him as a creditor.

In his post-trial brief, Schouten cursorily asserts that he was harmed by "[t]he mere passage of time", as "[w]itnesses became difficult (or impossible) to locate", and he "lost collection time." *Id.* at 11. He also testified at trial, referring to his deposition in this proceeding, that his "memory was better back then than it is now." ECF No. 65, at 74:1–:2. But nothing in the trial record supports Schouten's suggestions of material witnesses gone to ghost and lost collection time. Schouten's faded memory appears to be the ordinary consequence of age and the pendency of litigation. He has not shown that his memory would have been materially better had he learned about the bankruptcy case—by way of ordinary notice as a properly listed creditor—a few months earlier than he did. Nor has he demonstrated in any concrete way that the delay, if any, in litigating his claims materially affected the outcome of the litigation.

In all events, even if the record did suggest that Schouten had suffered the sort of harm he asserts, it is not the sort of harm with which *Stark* is concerned. *Stark* is primarily concerned with "the right of the creditor . . . to . . . file a proof of claim" and to thereby preserve his right to recover from the bankruptcy estate if there are assets "from which a dividend might be paid." 717 F.2d at 324. Here, as in *Stark,* no creditors were paid because there were no assets available for distribution, but the case has been reopened, and Schouten has been listed as a creditor; "should subsequent assets be found," he "will have the opportunity to file a claim" like the other creditors. *Id.* Thus, he is no worse off than if he'd been listed as a creditor from the outset of the case.

C

The circumstances surrounding the Jakubiaks' failure to list Schouten and to schedule Robert Jakubiak's debt to him meet the conditions for applying *Stark*'s equitable exception to §523(a)(3)(A); however, that does not fully resolve this matter. As explained above, *Smith* directs that *Stark*'s equitable limitation for inadvertently unscheduled debts does not apply to §523(a)(3)(B) debts—that is, unscheduled debts of a kind specified in §523(a)(2), (4), or (6). See 582 F.3d at 778 n.4. Whether such debts are excepted from discharge is governed by §523(a)(3)(B)'s text alone: "All that need be shown . . . is that the debt in question was unscheduled and the creditor did not have notice or actual knowledge of the bankruptcy in time to file a claim and a request for a determination that the debt was nondischargeable." *Id.* at 777.

Jakubiak does not dispute that most of §523(a)(3)(B)'s requirements are met. Again, the Jakubiaks did not schedule the debt or list Schouten as a creditor in time for him to timely file a proof of his claim or request a determination of dischargeability, and Schouten lacked notice or actual knowledge of the case "in time for such timely filing and request". §523(a)(3)(B).

The parties only dispute whether Schouten's "debt is of a kind specified in" §523(a)(2), (4), or (6). More specifically they dispute whether Jakubiak's debt to Schouten is for money obtained by false pretenses, false representations, or actual fraud under §523(a)(2) or for willful and malicious injury under §523(a)(6).

1

The critical first question in determining whether the debt is of a kind specified in §523(a)(2) or (6) is, what does the debt represent? In other words, what is the basis for Schouten's $75,000 award from FINRA's arbitrator that the state-court judgment confirms? Schouten argues in his post-trial brief that "Jakubiak engaged in an annuity flipping scheme", which is to say, that Jakubiak repeatedly duped him into transferring funds from one annuity to another solely to generate commissions for himself. ECF No.

60, at 2–6.

At summary judgment, the court concluded that the "most reasonable inference . . . is that the award", and thus the judgment confirming it, is "for the $75,000 of loans that Jakubiak never repaid." Amended Decision, *supra*, at 17 & 20 ("[T]he simplest explanation of the $75,000 award is that it is compensation *for* the $75,000 unpaid loan principal."). That remains true. Schouten presented no evidence at trial that the $75,000 debt bears any connection to damages from any purported annuity flipping. Having considered the trial evidence, the court finds that the debt is for the $75,000 Jakubiak borrowed from Schouten and never repaid.

2

That the debt is for Schouten's loans to Jakubiak does not foreclose a determination that the debt is also for money obtained by fraud, false pretenses or false representations under §523(a)(2). If, for example, Jakubiak borrowed money from Schouten while engaged in an ongoing effort to fleece him, that could amount to a debt for money obtained by false pretenses. If Jakubiak had lied to Schouten about his intent to repay the loan or, perhaps, deliberately concealed that he should not have been borrowing money from clients, that might lead to a conclusion that the debt is for money obtained by a false representation or actual fraud. See *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) ("[F]raud . . . includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." (quoting *Stapleton v. Holt*, 250 P.2d 451, 453–54 (Okla. 1952))).

Schouten's trial testimony, however, puts a quick end to this line of reasoning. Schouten's own attorney asked, "If you knew everything that you know now, would you have loaned Mr. Jakubiak money?" ECF No. 65, at 71:23–24. Schouten equivocated in response:

> Well, if I thought that he -- geez, man, yeah. I suppose, if I thought he was being dishonest with me in doing transactions, I probably would have been

> hesitant, but you know, he portrayed himself as being in trouble. And I just thought that I was being helpful to him by assisting him in his trouble.

ECF No. 65, at 71:25–72:5. It is striking that Schouten, who has spent more than six years in arbitration and state and federal litigation against Jakubiak trying to pry back the money he loaned his one-time friend, could manage no more than that he would have been *hesitant* to loan Jakubiak money if he'd known then *everything* he knows now.

The Supreme Court in *Field v. Mans*, 516 U.S. 59, 66 (1995), observed that "some degree of reliance is required to satisfy the element of causation inherent in the phrase 'obtained by'" in §523(a)(2)(A). Here, Schouten's testimony—the only evidence as to reliance or causation more broadly—revealed that he does not know whether he would have loaned Jakubiak money even if he had known everything about what he now insists was a years-long scheme by Jakubiak to defraud him. Schouten's testimony, even considered alongside all the other evidence from trial, is insufficient to prove reliance in fact—that is, that any of the representations, omissions, pretenses, or frauds he attributes to Jakubiak contributed to his decision to loan Jakubiak $75,000. Schouten failed to prove that the debt was for money *obtained by* false pretenses, false representations, or actual fraud. As a result, the court finds that Schouten did not meet his burden to prove that the debt is of a kind specified in §523(a)(2).

3

Schouten also contends that the debt is of the kind specified in §523(a)(6), i.e., that it is "for willful and malicious injury by the debtor to another . . . or to the property of another". Although "courts are all over the lot in defining [the] phrase ['willful and malicious'] in section 523(a)(6)", *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 322 (7th Cir. 2012), minimally, "a creditor invoking section 523(a)(6) must prove an intent to inflict injury." *Heinrich v. Bagg (In re Bagg)*, 589 B.R. 650, 656 (Bankr. E.D. Wis. 2018).

Schouten has not met that burden. The evidence here simply does not establish that Jakubiak borrowed money from Schouten "with [any] level of malice, wickedness,

or a specific intent to inflict injury", as required to obtain relief under §523(a)(6). *Id.* (citing *First Weber Group, Inc. v. Horsfall*, 738 F.3d 767, 774–75 (7th Cir. 2013)). Consequently, Schouten has not shown that the debt is of a kind specified in §523(a)(6).

4

Finally, the court concludes that Schouten waived any arguments in support of his §523(a)(3)(B) claim that are not addressed above or are otherwise rendered immaterial by the preceding discussion. At trial, as on appeal, a party must both "demonstrate specific facts *and* indicate their relevance under the correct legal standard." *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002) (emphasis added). This, of course, generally requires "citation to pertinent legal authority". See, e.g., *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009). Schouten has not articulated a coherent legal standard against which his §523(a)(3)(B) claim can be assessed, and he has not provided any clear explanation as to how the trial evidence satisfies any such standard. Which is to say, Schouten has failed in virtually every respect to show that he is entitled to relief under §523(a)(3)(B).

As discussed above, to prevail on his §523(a)(3)(B) claim, Schouten had to prove that the debt at issue is either (1) "for money . . . obtained by . . . false pretenses, a false representation, or actual fraud" or (2) "for willful and malicious injury by the debtor to another entity or to the property of another entity". §523(a)(2)(A) & (6). In his pre-trial report, Schouten lists the elements that he believes govern the determination of "false pretenses, a false representation, or actual fraud" for purposes of §523(a)(2)(A) and "willful and malicious injury" for purposes of §523(a)(6). See ECF No. 42, at 3–4. But in his post-trial brief—which he filed in lieu of a closing statement at trial—Schouten does not refer to any of these elements, explain how the facts evinced at trial might satisfy them, or even cite to §523 at all. See ECF No. 60.

Schouten's post-trial brief accuses Jakubiak of acting fraudulently or making false representations (e.g., by engaging in "an annuity flipping scheme" or other

conduct constituting an "unfair trade practice" under state law) and notes some trial evidence arguably supportive of those characterizations of Jakubiak's conduct. *Id.* Yet, he never cogently argues that the $75,000 debt at issue is for (1) money obtained by Jakubiak's supposedly fraudulent conduct or false representations or (2) willful and malicious injury resulting from such conduct. Schouten thus fails to show that the facts, established by the evidence at trial and assessed against the correct legal standard, demonstrate that Jakubiak's debt to him is of a kind specified in §523(a)(2) or (6), so as to entitle him to relief under §523(a)(3)(B).

Despite Schouten's overwhelming failure to set forth an intelligible theory of the case under which he is entitled to relief, the court has made every reasonable effort to discern and respond to his arguments in support of his §523(a)(3)(B) claim. Ultimately, though, "[i]t is not this court's responsibility to research and construct the parties' arguments." *Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (quoting *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000)). Accordingly, any arguments Schouten may have made during this proceeding as to his claim under §523(a)(3)(B) not otherwise addressed in or resolved by this decision are waived as "[p]erfunctory", "undeveloped", or "unsupported by legal authority." *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) (citing *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006)).

V

For these reasons, Jakubiak's debt to Schouten is not excepted from discharge. The court will separately order the entry of judgment for Jakubiak.

#####